# UNITED STATES *v.* AMERICAN BELL TELEPHONE COMPANY.

APPEAL FROM THE COURT OF APPEALS FOR THE FIRST CIRCUIT.

No. 344. Argued November 9, 10, 11, 1896. — Decided May 10, 1897.

If an application has been made for a patent for an invention, and the applicant has once called for action, he cannot be deprived of any benefits which flow from the ultimate action of the tribunal, although that tribunal may unnecessarily, negligently or even wantonly, if that supposition were admissible, delay its judgment.

*Maxwell Land Grant case,* 121 U. S. 325, affirmed and followed to the point that a suit between individuals to set aside an instrument for fraud can only be sustained when the testimony in respect to the fraud is clear, unequivocal and convincing, and cannot be done upon a bare preponderance of evidence which leaves the issue in doubt; and that if this be the settled rule in respect to suits between individuals it is much more so when the Government attempts to set aside its solemn patent: and if this is true when the suit is to set aside a patent for land, which conveys for all time the title, *a fortiori* it must be true when the suit is one to set aside a patent for an invention which only grants a temporary right.

The case which the counsel for appellant presents may be summed up in these words: The application for this patent was duly filed. The Patent Office after the filing had full jurisdiction over the procedure; the applicant had no control over its action. We have been unable to offer a syllable of testimony tending to show that the applicant ever in any way corrupted or attempted to corrupt any of the officials of the department.

We have been unable to show that any delay or postponement was made at the instance or on the suggestion of the applicant. Every communication that it made during those years carried with it a request for action, yet because the delay has resulted in enlarged profits to the applicant, and the fact that it would so result ought to have been known to it, it must be assumed that in some way it did cause the delay, and having so caused the delay ought to suffer therefor. There is seldom presented a case in which there is such an absolute and total failure of proof of wrong.

Before the Government is entitled to a decree cancelling a patent for an invention on the ground that it had been fraudulently and wrongfully obtained, it must, as in the case of a like suit to set aside a patent for land, establish the fraud and the wrong by testimony which is clear, convincing and satisfactory.

Congress has established a department with officials selected by the Government, to whom all applications for patents must be made; has prescribed the terms and conditions of such applications, and entrusted the entire management of affairs of the department to those officials; and when an applicant for a patent complies with the terms and conditions prescribed and files his application with the officers of the department he must abide their action, and cannot be held to suffer or lose rights by reason of any delay on the part of those officials, whether reasonable or unreasonable, unless such delay has been brought about through his corruption of the officials, or through his inducement, or at his instance: and proof that they were in fault, that they acted unwisely, unreasonably, and even that they were culpably dilatory, casts no blame on him and abridges none of his rights.

The evidence in this case does not in the least degree tend to show any corruption by the applicant of any of the officials of the department, or any undue or improper influence exerted or attempted to be exerted by it upon them, and on the other hand does affirmatively show that it urged promptness on the part of the officials of the department, and that the delay was the result of the action of those officials.

If the circumstances do not make it clear that this delay on the part of the officials was wholly justified they do show that it was not wholly unwarranted, and that there were reasons for the action of such officials, which at least deserve consideration and cannot be condemned as trivial.

It is unnecessary to determine whether there are two separate inventions in the transmitter and the receiver, or whether the patent of 1891 is for an invention which was covered by the patent of 1880; as the judgment of the Patent Office, the tribunal established by Congress to determine such questions, was adverse to the contention of the Government, and such judgment cannot be reviewed in this suit.

Suits may be maintained by the Government in its own courts to set aside one of its patents not only when it has a proprietary and pecuniary interest in the result, but also when it is necessary in order to enable it to discharge its obligations to the public, and sometimes when the purpose and effect are simply to enforce the rights of an individual; in

the former cases it has all the privileges and rights of a sovereign, the statutes of limitation do not run against it, the laches of its own officials does not debar its right; but when it has no proprietary or pecuniary result in the setting aside of the patent; is not seeking to discharge its obligations to the public; when it has brought the suit simply to help an individual; making itself, as it were, the instrument by which the right of that individual against the patentee can be established, then it becomes subject to the rules governing like suits between private litigants.

In establishing the Patent Office, Congress created a tribunal to pass upon all questions of novelty and utility, and it gave to that office exclusive jurisdiction in the first instance, and specifically provided under what circumstances its decisions might be reviewed, either collaterally or by appeal; and when Congress has thus created a tribunal to which it has given exclusive determination in the first instance of certain questions of fact and has specifically provided under what circumstances that determination may be reviewed by the courts, the argument is a forcible one that such determination should be held conclusive upon the Government, subject to the same limitations as apply in suits between individuals.

On February 1, 1893, the United States filed in the Circuit Court of the United States in and for the District of Massachusetts a bill in equity against the American Bell Telephone Company and Emile Berliner, praying a decree to set aside and cancel patent No. 463,569, issued on November 17, 1891, to the telephone company, as assignee of Berliner. Upon amended pleadings and proofs the Circuit Court on January 3, 1895, 65 Fed. Rep. 86, entered a decree as prayed for. On appeal to the Court of Appeals for the First Circuit this decree was on May 18, 1895, reversed, and a decree entered directing a dismissal of the bill. 33 U. S. App. 236. Thereupon the United States took an appeal to this court. A motion was made to dismiss the appeal for want of jurisdiction, which was denied, 159 U. S. 548, and the case was argued upon the merits.

As stated by counsel for the appellant, four grounds for relief were presented and discussed in the Circuit Court. Those grounds are:

" 1. That the delay of the application in the office for thirteen years was, under the circumstances alleged in the bill, unlawful and fraudulent.

" 2. That a patent, issued November 2, 1880, upon a division of the original application, covers the same invention as

that covered by the patent in suit, and exhausted the power of the Commissioner as to that invention.

"3. That the patent is not for the same invention which was described in the application as filed.

"4. That, taking the application to date from the time when it was made by amendment to cover the invention described and claimed in the patent as issued, it was barred by public use for more than two years."

By that court only the first two were considered, and the argument in the Court of Appeals was confined to those questions.

*Mr. Robert S. Taylor* and *Mr. Causten Browne* for appellants. Mr. Attorney General was on their brief. *Mr. Charles H. Aldrich* also filed a brief for appellants.

It was contended in the briefs and in argument; (*a*) that the Berliner patent was void by reason of the delay in the Patent Office, which was in the nature of a fraud on the public; (*b*) that it was void by reason of the Berliner patent of November 2, 1880 ; (*c*) that it was void because the application of June 4, 1877, did not describe the constant-contact transmitter; (*d*) that it was void because of irregularities in the Patent Office, aside from questions of delay; (*e*) that it was void because the process and apparatus claimed were a part of Bell's invention, disclosed in patent No. 174,465 of March 7, 1876. As to point (*a*) appellants' counsel said, in addition to other things quoted in the opinion, *post:*

The delay in the office is the great fact in the case. It determined the bringing of the suit, stands in the forefront of the bill, was the principal question argued in both courts below, and occupies the chief space in the decisions rendered. It is not set up as laches, nor as a ground of forfeiture under any provision of the law or rule of the Patent Office, but as a course of conduct in the nature of fraud on the public. The effect of this delay as a question of law is the first point to be considered. The facts necessary to present the question may be stated very briefly as follows:

In 1878, the Bell Company, under patents to Bell and others, was just entering upon that splendid exploitation of the art of telephony which has since challenged the admiration of the world. The transmission of speech in that way requires the use of two instruments: the first, — the transmitter, into which the speaker talks, and the second, the receiver, at which the hearer listens. Mr. Bell's patent of 1876 described an instrument which could be used interchangeably for either of these purposes. In 1878 Mr. Edison and Mr. Blake produced transmitters, both unlike Bell's, and differing from each other in detail, but operating on the same general principle. They both belonged to the class of transmitters called microphones, the distinguishing feature of which is that the undulations of the electrical current by means of which the sonorous vibrations of the air in the transmitter are caused to be reproduced in the receiver, are caused by variations of pressure between two electrodes remaining constantly in contact, which variations of pressure are caused by the vibrations of the diaphragm of the transmitter in the manner described in Berliner's specification. The Bell Company acquired the title to both these inventions, the latter immediately upon its production, and the former in 1879; and afterwards used the microphone exclusively, or practically so, in all its great and expanding business. No other transmitter yet produced compares with it in practical utility and value.

In November, 1891, the public were astonished to learn that a patent had just been issued to the Bell Company, covering in the broadest possible terms the identical microphone transmitter for which they had been paying rentals for thirteen years, under which new patent it would be entitled to exact a continuance of the same rentals for the same instrument for seventeen years longer.

An examination of the files in the Patent Office, then for the first time accessible to the public, showed that the application for this patent had been filed by Emile Berliner, June 4, 1877, and had become the property of the Bell Company in 1878, and had been controlled by that company to the time

of its issue. It was the extraordinary delay in the issue of the patent, the application being all the time under the control of the Bell Company, coupled with the manifest interest of that company to prolong its monopoly by means of that delay, and the evidence found in the record that it had yielded to that temptation, and the wrong done to the public by the issue of the patent after such delay, that led to the bringing of the suit. With these facts were also alleged in the bill other facts of which counsel had information at the time it was drawn, which appeared to impugn the validity of the patent.

Was this long delay in the issue of the patent an injury to the public? Was it a violation of any duty imposed by law, either statutory or unwritten? These questions must be answered by reference to the nature of a patent for invention, and the rights, duties and obligations of the parties to it.

A patent is a grant upon a consideration. It is in substance a contract. The essence of the contract is that the inventor shall first have the exclusive enjoyment of the invention for a stated period, and that after that the public shall have it. The contract is executed on the part of the public by the issue of the patent; on the part of the inventor by placing on the records of the Patent Office such full and complete description of the invention as will enable the people to use it when his monopoly expires.

The thing which the public pay for in submitting to the monopoly created by a patent is the free enjoyment of the invention after the patent expires. If this means anything, it is the use of the machine or thing or process in which the invention is embodied, not the possession of a piece of paper, nor to have accessible the scientific or other information contained in the specification. To deny to the public this free use of the invention to which it has become entitled under the contract is to take away from it a thing of value which it has bought and paid for.

A second patent covering the same thing has this effect. It deprives the public of the consideration which it was to receive for being excluded from the free use of the thing during the life of the first patent.

Nevertheless, as our patent laws stand, this may sometimes occur. A single machine or thing may have embodied in it more than one invention. These inventions may be the work of different inventors, or of the same inventor at different times, and each entitled to a patent, — one as justly and clearly as the other. And the patents so issued at different times may each confer a monopoly of the use of the thing. In such a case the people are excluded from the free use of the thing until the expiration of both patents.

In the present case Mr. Bell's patent of 1876 covered broadly the process of transmitting sound by means of an undulatory electric current, as distinguished from an interrupted or broken current, no matter how produced. His patent showed a transmitter capable of producing such a current, but so feebly that its use was limited to short distances. Afterwards Mr. Berliner discovered, we will say, that the undulatory current necessary to transmit speech can be produced by means of another form of transmitter, — one operating by variation of pressure between its electrodes at their point of contact. But as the only function of the instrument was to produce an undulatory current, and as the use of that current, however produced, was covered by Mr. Bell's invention, it follows that the instrument was subject to two independent monopolies.

Later, we will say, Mr. Edison discovered that the use of carbon as the material for the construction of the electrodes of the Berliner transmitter gave to that instrument a greatly increased power and reach of operation. Later still Mr. Blake devised a particular combination of carbon and metallic electrodes, with mechanism for their mounting, which secured an improved ease and permanence of adjustment and superior adaptation to common use. Mr. Bell hit upon the true principle, in relation to the kind of current to be employed, and was justly entitled to a patent for it, although the range of his transmitter may have been but a few hundred feet. Mr. Berliner, we will say, hit upon the true principle underlying the operation of the microphone, and was entitled to his patent, although the mechanism he used in the embodi-

ment of his thought was so unstable in its adjustment as to make it of uncertain value. The inventions of Mr. Edison and Mr. Blake completed the instrument, and made possible the talking telephone in every man's house, the city exchange, and the long-distance line from city to city.

It thus happened that the Blake transmitter introduced into public use by the Bell Company in 1878, and familiar to us all, was the embodiment in one piece of mechanism, and its use of four distinct inventions made by four different men. That company was the owner of all the inventions. For Mr. Bell's invention it held patents issued in 1876 and 1877;. for Mr. Blake's, patents were issued in 1881 ; and for the others, applications were on file subject to its control.

Mr. Bell's invention was one of the first rank, — nothing less than the discovery of a new law of nature. Mr. Berliner's invention was a beautiful intellectual conception of a mode of operation. Mr. Edison's was the discovery of a new property of carbon. Mr. Blake's was an ingenious and a practical utilization of the three. Mr. Bell's invention lies at the foundation of the art of telephony. Mr. Edison's and Mr. Blake's have done more to make the art of practical value than all others following Bell.

We assume that it was not possible to take out patents for all these inventions at the same time. And so far as that was not possible, the overlapping and prolongation of the monopolies created by the patents in the use of the carbon microphone could not be avoided without denying to some one or more of the inventors his right under the law. But does it follow that the Bell Company was entitled of right to hold control of the microphone under the broad claims of the Bell patent and the construction and combination claims of the Blake patents, and nurse the applications for the other inventions in the office, taking out a patent on Berliner's just in time to overlap Bell's, and on Edison's in time to overlap Berliner, and so secure a monopoly on the same transmitter used in the same way to produce the same result for three times the period fixed by the statute for the duration of a patent ?

It needs no lawyer's argument to make manifest the inherent moral wrongfulness of such a proceeding toward the public. Every right-minded man will feel it instinctively. Would it be a legal wrong?

It is assumed in this case that such a result would be contrary to the spirit and intent of the patent law. That is one of the postulates of the bill. The statute deals in terms with one invention and one patent at a time. It is its plain purpose that the patentee shall enjoy first his monopoly in the thing in which his invention is embodied, — the machine, instrument, manufacture or process which can be sold, rented or used with pecuniary profit, — and that at the expiration of the term of the patent the public shall enter freely into the same enjoyment of *that same thing.* It does not affect the validity of this assumption that, in the practical administration of the business, the prolongation of monopolies in the way pointed out may occur sometimes and to some extent. They are the unintended results of the operation of the law, contrary to its general spirit and intent.

Whether such results were not foreseen by Congress, or being foreseen were regarded as unavoidable, does not matter. The fact that the machinery of the law is not always adequate to the perfect attainment of its intent is no reason why the intent shall be denied or disregarded.

That is to say, if, under the circumstances of a particular case, the public cannot have the free enjoyment of an invention upon the expiration of a patent which has given the exclusive enjoyment of it to a patentee, because rights have supervened under another patent, the intent of the law still requires that each deprivation shall be for the *shortest time consistent with the rights of the second patentee.*

Hence a man who is enjoying a monopoly under one patent, and is at the same time prosecuting an application for another patent which will give him a monopoly of the same thing for a further period, *is bound to speed his application.*

That obligation is an entirely different thing from the duty of applicants generally to use diligence. It is a special equitable obligation growing out of the special circumstances

under which that application is prosecuted. It has no relation whatever to the regulations and rules provided for the transaction of business between applicants and the office. It arises independently of the statutes and the rules. It would exist exactly as it exists now if there were neither statute nor rules fixing any limitation of time in respect to filing an application, or the steps in its prosecution.

To put the very case assumed in the last sentence, let us suppose that the patent statute consisted of one section authorizing the Commissioner to grant a patent for a term of seventeen years upon a verified application, but containing no other limitation of time as to any part of the business. A citizen holding one patent makes application for another covering the same thing in some other aspect, say as to its construction, material or mode of operation. His application is allowed, and wants only the payment of a final fee to be issued. The clerk in whose custody it is sticks it in a pigeon-hole, and there it remains for ten years, at the end of which time the patent issues. The public, in the meantime, know nothing of the second application, and pay the tribute exacted under the first patent, in the expectation of the free use of the thing therein described at its expiration. The applicant knows all the facts, and, for the express purpose of procuring a prolongation of his monopoly, lets his application sleep in its pigeon-hole year after year, taking out a patent upon it just in time to overlap the first patent.

That is this case stripped bare. The Court of Appeals for the First Circuit held that the eye of a chancellor can see nothing wrong in such a transaction. We say that such a proceeding would be a violation of the spirit and intent of the law, a fraud upon it, a prostitution of it; and all this notwithstanding it would fulfil every vowel and consonant of its letter.

All these propositions seem to us to have a just foundation in the essential nature of the transaction between a patentee and the public. They are the equitable incidents of the contract or grant, or whatever it may be called. They flow naturally and logically from a fair consideration of the purpose, spirit and intent of the patent statutes.

But they may be rested equally well upon a deeper and broader foundation. When a man goes into the Patent Office as an applicant he does not leave behind him the equitable obligations toward his fellows which attach to him in other relations of life. They follow him there, and he is answerable there as elsewhere for the just discharge of them. Among the maxims which define those obligations, none is of higher authority or wider application than that golden rule of the law, *Sic utere tuo ut alienum non lædas.* Let every man use his own so as not to interfere in any way or degree which he can avoid with the enjoyment by his neighbor of that which is his.

In buying and prosecuting Berliner's application the Bell Company was pursuing its lawful right; but it was bound to pursue that right in such a manner as not to trespass upon the rights of others, or subject others to injury in any way or degree which it was possible to avoid. This duty it could only discharge by speeding its application, and so reducing as far as possible that prolongation of its monopoly of the microphone which must result from the grant of its patent.

We shall be told that there is no precedent for this suit. But there is certainly a precedent for the repeal of a patent obtained by fraud upon the Commissioner, and through him upon the public, which is the ultimate subject of and sufferer from the fraud; and the real question is, whether such circumstances as we have alleged to be the circumstances of the obtaining of this Berliner patent constitute a fraud upon the public.

We need not look for any precedent of such a question as that. Fraud is never-ending in the variety of its forms. And the crowning honor of equity is that no form imposes upon it when the substance of the transaction is fraudulent. Some of the greatest judgments in the history of the law have been those in which its capacity for extension by construction to meet new forms of wrong has been asserted, illustrated and applied.

The wrong here alleged is a new one. But it wants for its correction no newly made law; only another, — scarcely a

new, application of old and settled principles. In the nature of things, there must always be around the area of the familiar and specifically settled law a zone of debatable ground. Within this territory the real battles of the law are fought and its great decisions made, the question always being, Do the old principles by fair and logical interpretation and extension cover the new case ?

There is a class of decisions outside the field of patent law to which this case has a logical, though in some respects a-remote, relationship. We refer to those decisions which deal with the duties of men who have voluntarily placed themselves in situations in which the pursuit of their own interests draws them into antagonism to the interests of others over which they have control. The most familiar illustration of this situation is that of a trustee dealing in his own interest with the business of his *cestui que trust.* Such a relationship not only puts upon the trustee a duty of the highest obligation, but puts upon him a burden of the gravest character when his proceedings become the subject of legal investigation. When a trustee has kept his own affairs free from entanglement with those of his *cestui que trust,* he is entitled to the full benefit of the presumption that his purpose has been to discharge his duty honestly and faithfully. But when it appears that he has dealt with the trust fund or property in his own interest, and with a result of profit to himself and loss to his *cestui,* a very different case is presented, and very different presumptions obtain.

Emphatic objection was taken to this line of argument upon the hearing below There was even a sort of complaint entered against the law itself in the remark of counsel in argument that "there has been manifest in late years a tendency in the law to transform all obligations into trusts"; in criticism of which was cited a paragraph from an opinion of Lord Westbury, quoting Lord Mansfield's famous epigram that "nothing in law is so apt to mislead as a metaphor."

That the tendency complained of exists is true. But it is not because the courts have been misled by metaphors. It is because they are progressively holding men to higher and

higher ethical standards. There is no noun in the language which broadly and aptly designates one who owes a legal duty to another. The word "trustee" comes nearest to it. And where the duty grows out of the possession or control of property, the analogy is so close that it is not misleading, but helpful. In some cases in which the word is used, we might doubtless have a better one; which illustrates the remark of De Tocqueville that it is easier to invent new things than new names for them.

That the Bell Company occupied the relation of trustee toward the public in any *technical* sense is not claimed. But it had valuable rights of the public within its control. As the owner of the Berliner application, it was intending to, and upon the hypothesis upon which we are now proceeding was entitled to, take out a patent which would exclude the public from the free use of the microphone after the time arrived when it would otherwise be entitled to it. The control of the application was largely in its own hands. It could speed it or delay it. To the extent to which it could thus determine the date of issue of its patent, it had the right — the property right — of the public under its control. Such control was entrusted to it by the law for the benefit of the public as well as itself. Its duty lay in one direction, its interest in the other. It is to this extent that we suggest an analogy between the situation of the Bell Company and that of a trustee who has profited at the expense of his *cestui que trust*. And to this extent the analogy is fair and the precedents are helpful.

In the same category belong many cases falling under the head of public policy, also cases holding men to fair dealing in relations of mutual confidence, employer and employé, principal and agent, fellow-stockholders in a corporation, fellow-property owners in a city, fellow-subscribers to a paper, and the like. We need not cite them. Their general scope and character are familiar.

The great question is, *was there a duty?* The appellees say, in answer to the charge of delay in the bill, that the patent was issued in accordance with the statute and rules. We

reply that. that was not enough; that over and above the mint, anise and cumin of the law lay the weightier obligation of justice toward all; that a binding duty *dehors* the letter of the law was violated. The appellees rejoin that no such obligation existed. So the Court of Appeals held.

Ought the fact that the terms of the statute and the rules were complied with to close the inquiry? Does the law know no obligations respecting statutory proceedings except statutory obligations? Is all that a man can make out of the government, or out of the people through the government, lawful game so long as he keeps the letter of the law?

These questions reach far beyond the confines of this case. How to keep the letter of the law is one of the fine arts of our time. The promoters of trusts, combines and all the countless schemes organized for the plunder of society are adepts in that art. Such an issue ought not to be decided against the people until all precedents and analogies have been searched and all fair reasonings tested.

The existence of a duty once established, all else follows easily. The measure of the diligence which it requires grows out of the circumstances. The importance of the interests involved, and the gravity of the consequences likely to occur from a neglect of it, enter into it, as in every case where diligence is an element of duty towards others.

*Mr. James McNaught* and *Mr. Joseph D. Redding* by leave of court filed a brief on behalf of the Standard Telephone Company in support of the appellants.

*Mr. Joseph H. Choate* and *Mr. Frederick P. Fish* for appellees. *Mr. James J. Storrow, Mr. W. W. Swan* and *Mr. W. K. Richardson* were on their brief.

MR. JUSTICE BREWER, after making the above statement, delivered the opinion of the court.

This is a suit by the United States to set aside a patent for an invention as wrongfully issued. It is, we believe, the first

case in this court in which upon proofs such an application has been presented. The right of the United States to maintain such a suit was affirmed in *United States* v. *American Bell Telephone Co.*, 128 U. S. 315. The question now is whether upon the facts disclosed in this record the relief prayed·for ought to be awarded. It becomes, therefore, a matter of moment to determine under what circumstances and upon what conditions the United States are entitled to have a patent issued in due course of law set aside and cancelled.

Many cases have come to this court, in which patents for lands have been sought to be set aside, and the rules controlling such suits have been frequently considered. Such decisions will naturally throw light upon the question here presented, though before adverting to them it may be well to note the difference between patents for land and patents for inventions. While the same term is used, the same grantor is in each, and although each vests in the patentee certain rights, yet they are not in all things alike. The patent for land is a conveyance to an individual of that which is the absolute property of the Government and to which, but for the conveyance, the individual would have no right or title. It is a transfer of tangible property; of property in existence before the right is conveyed; of property which the Government has the full right to dispose of as it sees fit, and may retain to itself or convey to one individual or another; and it creates a title which lasts for all time. On the other hand, the patent for an invention is not a conveyance of something which the Government owns. It does not convey that which, but for the conveyance, the Government could use and dispose of as it sees fit, and to which no one save the Government has any right or title except for the conveyance. But for the patent the thing patented is open to the use of any one. Were it not for this patent any one would have the right to manufacture and use the Berliner transmitter. It was not something which belonged to the Government before Berliner invented it. It was open to the manufacture and use of any one, and any one who knew how could contrive, manufacture and use the instrument. It conveyed to Berliner, so far as

respects rights in the instrument itself, nothing that he did not have theretofore. The only effect of it was to restrain others from manufacturing and using that which he invented. After his invention he could have kept the discovery secret to himself. He need not have disclosed it to any one. But in order to induce him to make that invention public, to give all a share in the benefits resulting from such an invention, Congress, by its legislation, made in pursuance of the Constitution, has guaranteed to him an exclusive right to it for a limited time; and the purpose of the patent is to protect him in this monopoly, not to give him a use which, save for the patent, he did not have before, but only to separate to him an exclusive use. The Government parted with nothing by the patent. It lost no property. Its possessions were not diminished. The patentee, so far as a personal use is concerned, received nothing which he did not have without the patent, and the monopoly which he did receive is only for a few years. So the Government may well insist that it has higher rights in a suit to set aside a patent for land than it has in a suit to set aside a patent for an invention. There are weightier reasons why the Government should not be permanently deprived of its property through fraudulent representations or other wrongful means, than there are for questioning the validity of a temporary monopoly or depriving an individual of the exclusive use for a limited time of that whose actual use he claims to have made possible, and which, after such time, will be open and free to all. Bearing in mind this distinction, let us inquire upon what conditions the Government may maintain a suit to set aside a patent for land.

These suits may be conveniently grouped in three classes: First, where, the Government being the only party interested, the patent is charged to have been obtained by fraud in representations or conduct. Second, where the land by appropriate reservation is not subject to patent, but is, nevertheless, erroneously patented. Third, where the land, though subject to patent in the ordinary administration of the land office, is patented to the wrong person either through fraud or by reason of mistake or inadvertence. In the first class are the fol-

lowing cases: *United States* v. *Hughes*, 11 How. 552; *United States* v. *Throckmorton*, 98 U. S. 61; *United States* v. *Atherton*, 102 U. S. 372; *Moffat* v. *United States*, 112 U. S. 24; *United States* v. *Minor*, 114 U. S. 233; *Maxwell Land Grant case*, 121 U. S. 325; *Colorado Coal & Iron Co.* v. *United States*, 123 U. S. 307; *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273; *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673; *United States* v. *Hancock*, 133 U. S. 193; *United States* v. *Trinidad Coal & Coking Co.*, 137 U. S. 160; *United States* v. *Budd*, 144 U. S. 154; *San Pedro &c. Co.* v. *United States*, 146 U. S. 120; — In the second are these: *United States* v. *Stone*, 2 Wall. 525; *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733; *McLaughlin* v. *United States*, 107 U. S. 526; *Western Pacific Railroad* v. *United States*, 108 U. S. 510; *Mullan* v. *United States*, 118 U. S. 271; — and in the third the following: *Hughes* v. *United States*, 4 Wall. 232; *United States* v. *Beebe*, 127 U. S. 338; *United States* v. *Marshall Mining Co.*, 129 U. S. 579; *United States* v. *Missouri, Kansas &c. Railway*, 141 U. S. 358; *United States* v. *Southern Pacific Railroad*, 146 U. S. 570.

The second and third classes are not paralleled in this case, for it is not claimed that there was no invention, or that the patent issued to the wrong party. The decisions in those classes need not be considered. The first class comprises all cases in which the land, though subject to patent and therefore within the jurisdiction of the land department, was charged to have been patented in consequence of fraudulent representations or conduct on the part of the patentee. The representations may have been as to the matter of right or the matter of quantity. The patentee may have been entitled to no land, or to less, or a different tract than that patented. In any event, fraud was the basis of the relief sought, and as fraud actual or constructive in the issue of the patent is the burden of this suit, we will quote from the opinions in some of these cases. In the *Maxwell Land Grant case*, Mr. Justice Miller, delivering the opinion of the court, said (p. 381):

"We take the general doctrine to be, that when in a court of equity it is proposed to set aside, to annul or to correct a

written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents and other solemn evidences of title emanating from the Government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumption that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof. It is not to be admitted that the titles by which so much property in this country and so many rights are held, purporting to emanate from the authoritative action of the officers of the Government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a court of justice; but it should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful."

In *Colorado Coal Co.* v. *United States*, Mr. Justice Matthews, after quoting part of the foregoing, adds (p. 317):

" It thus appears that the title of the defendants rests upon the strongest presumptions of fact, which, although they may be rebutted, nevertheless can be overthrown only by full proofs to the contrary, clear, convincing and unambiguous. The burden of producing these proofs and establishing the conclusion to which they are directed rests upon the Government. Neither is it relieved of this obligation by the negative nature of the proposition it is bound to establish. It is,

indeed, sometimes said that a negative is incapable of proof, but this is not a maxim of the law. In the language of an eminent text writer: 'When the negative ceases to be a simple one — when it is qualified by time, place or circumstance — much of this objection is removed; and proof of a negative may very reasonably be required when the qualifying circumstances are the direct matter in issue, or the affirmative is either probable in itself, or supported by a presumption, or peculiar means of proof are in the hands of the party asserting the negative.'"

Then, after quotations from many authorities, the learned Justice closes the discussion with these words from 1 Greenleaf on Evidence, sec. 80:

"So, where the negative allegation involves a charge of criminal neglect of duty, whether official or otherwise; or fraud; or the wrongful violation of actual lawful possession of property; the party making the allegation must prove it; for in these cases the presumption of law, which is always in favor of innocence and quiet possession, is in favor of the party charged."

In *United States* v. *Marshall Mining Company*, Mr. Justice Miller again refers to this matter, saying (p. 589):

"The dignity and character of a patent from the United States is such that the holder of it cannot be called upon to prove that everything has been done that is usual in the proceedings had in the land department before its issue, nor can he be called upon to explain every irregularity or even impropriety in the process by which the patent is procured."

With these declarations of the law controlling such cases we proceed to consider that which, according to the brief of counsel for the Government, is the principal matter in this case. We quote their words:

"The delay in the office is the great fact in the case. It determined the bringing of the suit, stands in the forefront of the bill, was the principal question argued in both courts below, and occupies the chief space in the decisions rendered. It is not set up as laches, nor as a ground of forfeiture under any provision of the law or rule of the Patent Office, but as a course of conduct in the nature of fraud on the public."

What was the delay in this case? The application by Berliner was made on June 4, 1877, he having filed a caveat on April 14, 1877. In 1878, and prior to October 23, the telephone company purchased Berliner's invention, and on November 17, 1891, a patent was issued to the telephone company, as assignee of Berliner. The application was, therefore, pending in the department fourteen years, during thirteen of which the invention was the property of the telephone company. The effect of this, it is said, is to prolong for all practical purposes the telephone monopoly during the lifetime of this patent; and in this way: On March 7, 1876, patent No. 174,465 was issued to Alexander Graham Bell, in which patent, as alleged in the bill and admitted in the answer, were described and claimed " a method of and apparatus for transmitting sound by means of an undulatory current of electricity." This was the original telephone patent. And it signified that Bell invented the telephone. That patent has expired and all the monopoly which attaches to it alone has ceased, and the right to use that invention has become public property. But while he invented the telephone, the apparatus he devised was inefficient for public uses. Berliner invented something by which, taken in connection with Edison's and Blake's inventions, Bell's undulatory current could be made practically available for carrying on conversation at long distances. In other words, the telephone, as we use it — that which has become such an important factor in the commercial and social life of to-day — does not embody simply the invention of Bell, but also those of Edison, Blake and Berliner. So that while the public has to-day, by reason of the expiration of the Bell patent, the right to use as it pleases his invention, such right is a barren one, and the telephone monopoly is practically extended to the termination of the Berliner patent. And this extension of the time of the monopoly has been accomplished by means of the delay in the issue of the Berliner patent, the long pendency of the application in the Patent Office. In order that the contention of the Government may be clearly presented, and in view of the importance of this question, we may properly quote at some length from the brief of counsel:

" In the present case Mr. Bell's patent of 1876 covered broadly the process of transmitting sound by means of an undulatory electric current, as distinguished from an interrupted or· broken current, no matter how produced. His patent showed a· transmitter capable of producing such a current, but so feebly that its use was limited to short distances. Afterwards Mr. Berliner discovered, we will say, that the undulatory current necessary to transmit speech can be produced by means of another form of transmitter — one operating by variation of pressure between its electrodes at their point of contact. But as the only function of the instrument was to produce an undulatory current, and as the use of that· current, however produced, was. covered by Mr. Bell's invention, it follows that the instrument was subject to two independent monopolies.

" Later, we will say, Mr. Edison discovered that the use of carbon as the material for the construction of the electrodes of the Berliner transmitter gave to that instrument a greatly increased power and reach of operation. Later still Mr. Blake devised a particular combination of carbon and metallic elec trodes, with mechanism for their mounting, which secured an improved ease· and permanence of adjustment and superior adaptation to common use. Mr. Bell hit upon the true principle, in relation to the kind of· current to be employed, and was justly entitled to a patent for it, although the range of his transmitter may have been but a few hundred feet. Mr. Berliner, we will say, hit upon the true principle underlying the operation of the microphone, and was entitled to his patent, although the mechanism he used in the embodiment of his thought was so unstable in its adjustment as to make it of uncertain value. The inventions of ·Mr. Edison and Mr. Blake completed the instrument, and made possible the talking telephone in every man's house, the city exchange and the long-distance line from city to city.

" It thus happened that the Blake transmitter introduced into public use· by the Bell Company in 1878, and familiar to us all, was the embodiment in one piece of mechanism and its use of four distinct inventions made by four different men.

That company was the owner of all the inventions. For Mr. Bell's invention it held patents issued in 1876 and 1877; for Mr. Blake's, patents were issued in 1881; and for the others, applications were on file subject to its control.

"Mr. Bell's invention was one of the first rank — nothing less than the discovery of a new law of nature. Mr. Berliner's invention was a beautiful intellectual conception of a mode of operation. Mr. Edison's was the discovery of a new property of carbon. Mr. Blake's was an ingenious and a practical utilization of the three. Mr. Bell's invention lies at the foundation of the art of telephony. Mr. Edison's and Mr. Blake's have done more to make the art of practical value than all others following Mr. Bell.

"We assume that it was not possible to take out patents for all these inventions at the same time. And so far as that was not possible, the overlapping and prolongation of the monopolies created by the patents in the use of the carbon microphone could not be avoided without denying to some one or more of the inventors his rights under the law. But does it follow that the Bell Company was entitled of right to hold control of the microphone under the broad claims of the Bell patent and the construction and combination claims of the Blake patents, and nurse the applications for the other inventions in the office, taking out a patent on Berliner's just in time to overlap Bell's, and on Edison's in time to overlap Berliner, and so secure a monopoly on the same transmitter used in the same way to produce the same result for three times the period fixed by the statute for the duration of a patent?

"It needs no lawyer's argument to make manifest the inherent moral wrongfulness of such a proceeding toward the public. Every right-minded man will feel it instinctively. Would it be a legal wrong?"

After discussing the injury to the public which results from the conduct described, they add:

"Hence a man who is enjoying a monopoly of a thing under one patent, and is at the same time prosecuting an application for another patent which will give him a monopoly of

the same thing for a further period, is bound to speed his application."

It will be perceived that it is conceded that some delay is unavoidable. In the very nature of things that is so. It is not possible that an application for a patent can be considered and determined on the instant. So it is not the fact, but the excessiveness of the delay of which complaint is made. The mere fact of delay does not, therefore, operate to deprive the inventor of his legal rights. Before he can be punished it must be shown that he has been guilty of a wrong — that he has caused the delay. It matters not whether the delay be reasonable or unreasonable, for a brief time or for many years, if the applicant is not responsible for it. Whatever may be the injury to the public, if the delay is caused solely through the negligence or inattention of the tribunal before which the application is pending, it is something for which the applicant is not responsible, and which does not affect his legal rights. There is often great delay in suits in the courts. Cases not infrequently are argued before the highest courts and not decided by them for weeks and sometimes for years. Whatever effect such delay may have upon the interests of others or of the public, so long as it results from the mere non-action of the courts, the rights of the suitor are unaffected. He cannot be punished on account of the delay of the tribunal before which he is presenting his suit.

Neither can a party pursuing a strictly legal remedy be adjudged in the wrong if he acts within the time allowed, and pursues the method prescribed by the statute. If the statute gives him five years within which to bring an action on a note he cannot be denied relief simply because he waits four years and eleven months. If he has two years after a judgment against him within which to take an appeal he may wait until the last day of the two years. Under section 4886, Rev. Stat., an inventor has two years from the time his invention is disclosed to the public within which to make his application, and unless an abandonment is shown during that time he is entitled to a patent, and the patent runs as any other patent for seventeen years from its date. He can-

not be deprived of this right by proof that if he had filed his application immediately after the invention the patent would have been issued two years earlier than it was, and the public therefore would have come into possession of the free use of the invention two years sooner. The statute has given this right, and no consideration of public benefit can take it from him. His right exists because Congress has declared that it should. It will not do to say that, because Congress has declared that seventeen years is the life of a patent, seventeen years is the limit of the possible monopoly; for the same legislation that gives seventeen years as the life of a patent gives two years within which an application for a patent may be made, and during that time, as well as while the application is pending in the department, the applicant has practically, if not legally, an exclusive use. A party seeking a right under the patent statutes may avail himself of all their provisions, and the courts may not deny him the benefit of a single one. These are questions not of natural but of purely statutory right. Congress, instead of fixing seventeen, had the power to fix thirty years as the life of a patent. No court can disregard any statutory provisions in respect to these matters on the ground that in its judgment they are unwise or prejudicial to the interests of the public.

And in this connection it is also well to notice these facts: Sec. 4888, Rev. Stat., requires an inventor to make application in writing to the Commissioner of Patents. That and the two or three succeeding sections prescribe what the application shall state, and by what it shall be accompanied. Section 4893 provides that on the filing of the application and the payment of fees "the Commissioner of Patents shall cause an examination to be made of the alleged new invention or discovery; and if on such examination it shall appear that the claimant is justly entitled to a patent under the law, and that the same is sufficiently useful and important, the Commissioner shall issue a patent therefor." Section 4894 reads:

"All applications for patents shall be completed and prepared for examination within two years after the filing of the application; and in default thereof, or upon failure of the appli-

cant to prosecute the same within two years after any action therein, of which notice shall have been given to the applicant, they shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the Commissioner of Patents that such delay was unavoidable."

Certain rules of procedure have been prescribed by the Commissioner of Patents, and a certain routine of practice has become established in that department. Now, all these matters of statutory enactment, rules, of procedure and routine of practice, are things over which an applicant has no control. When he has once filed his application, complying with the statutory requirements, then the Patent Office takes possession of the matter. It determines when and how it will act, and the applicant can only ask and wait.

And why should he be called upon to do more? He comes before the tribunal which the Government has established and presents his application. Why should the validity of the grant which that tribunal finally makes depend in any degree upon the number of times he has repeated his application? The true rule is that if application has been made and the applicant has once called for action, he cannot be deprived of any benefits which flow from the ultimate action of the tribunal, although that tribunal may unnecessarily, negligently or even wantonly, if that supposition were admissible, delay its judgment. If the public is interested in prompt action, if the Government which represents the public thinks that more speed on the part of any of its tribunals is essential, it is the Government which is called upon to act, and the applicant may with propriety wait until either the tribunal has acted or until the Government, having regard for the public interest, has interfered to compel action. Accepting the statement of counsel as to the facts to be correct in all its fulness, consider what would have been the ruling of a court if an application had been made to it based upon those facts. Suppose the applicant had presented its petition for a mandamus to compel prompt action on the part of the patent officials and said, "I have applied for and am entitled to a patent. It will be issued after a while without any judicial

compulsion. I can make large profits if the Patent Office will be dilatory, and yet I ask a mandamus to compel its immediate action," would not the ruling have been, "By your own showing you are entitled to no relief; you have no cause of complaint; it is the Government, representing the public, which alone can complain"? And if it could obtain no assistance by a suit in advance, can it be punished indirectly by being deprived of that which was finally awarded to it?

Much is said in the briefs and in the arguments about the practical continuance of the telephone monopoly. It is well to understand exactly what is meant thereby. No one questions that the Bell patent has expired, and that all of his invention is free to the use of the public. It is not denied that Berliner's invention is something independent and distinct from the Bell invention. It is the combination of these inventions with those of Blake and Edison which makes the instrument in commercial use, and because this is the most serviceable it is the one that the public insists upon having. But each invention has independent rights. It loses nothing because when united with another it results in an instrument more valuable than either alone will give. Suppose that at the expiration of this Berliner patent some new invention shall be made by which in connection with those already free to the public an instrument can be manufactured far surpassing in utility that used to-day, and the Bell Company shall purchase that invention, the public, which always insists on having the best and most serviceable, will undoubtedly take the new instrument, and in that way it may happen that what is called the telephone monopoly is practically still further continued. But surely that does not abridge the legal rights of any one. The inventor of the latest addition is entitled to full protection, and if the telephone company buys that invention it is entitled to all the rights which the inventor had. All that the patent law requires is that when a patent expires the invention covered by that patent shall be free to every one, and not that the public has the right to the use of any other invention, the patent for which has not expired, and which adds to the utility and advantage

of the instrument made as the result of the combined inventions.

Counsel seem to argue that one who has made an invention and thereupon applies for a patent therefor, occupies, as it were, the position of a quasi trustee for the public; that he is under a sort of moral obligation to see that the public acquires the right to the free use of that invention as soon as is conveniently possible. We dissent entirely from the thought thus urged. The inventor is one who has discovered something of value. It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention. He does not make the law. He does not determine the measure of his rights. The legislative body, representing the people, has declared what the public will give for the free use of that invention. He cannot be heard in the courts to say that it is of such value that he is entitled to a larger and longer monopoly; that he is not fully compensated, by the receipts during seventeen years, for the great benefit which his invention has bestowed. No representative of the public is at liberty to negotiate with him for a new and independent contract as to the terms and conditions upon which he will give up his invention. He must come under the dominion of the statute, and take that which the public has proffered its willingness to give. As the lawmaking power has prescribed what the public will give, specified the terms and conditions of purchase, indicated the time and methods of determining the right of compensation, he on his part has an absolute legal right to avail himself of all the provisions thus made. It is not of course doubted that the courts in construing the patent as all other statutes, must have regard to the spirit as well as the letter. That simply requires that courts shall ascertain their true meaning, but when that is ascertained the applicant for a patent is entitled to all the benefits which those statutes thus construed give.

What are the evidences of wrong in this matter of delay? It may have been caused either by the negligent or wrongful

action of the officers of the department, and without any connivance, assistance or concurrence on the part of the applicant, or it may have been brought about by the applicant, either through its corruption of the public officers, or through other misconduct on its part. If the fault is wholly that of the department, the applicant ought not to suffer therefor. While, on the other hand, if its conduct has been wrongful, it may and ought to suffer. There is no presumption against the applicant. If a tribunal charged with official action delays such action, whatever of presumption surrounds the delay attaches to the tribunal, and no evidence of wrong being given, the presumption would be that the delay was at the instance of the tribunal and not caused by the applicant. The Government, therefore, in order to make out its case, must affirmatively show that the delay has been caused in some way by the conduct of the applicant, and before its patent can be set aside the Government must, in accordance with the rules laid down in respect to land patents, establish that fact clearly. It may not rest on mere inferences, mere suggestions, but must prove the wrong in such a manner as to satisfy the judgment, before it can destroy that which its own agents have created. We reiterate what was said by Mr. Justice Miller, for the court, in the *Maxwell Land Grant case*, that a suit between individuals to set aside an instrument for fraud can only be sustained when the testimony in respect to the fraud is clear, unequivocal and convincing, and cannot be done upon a bare preponderance of evidence which leaves the issue in doubt; and that if this be the settled rule in respect to suits between individuals it is much more so when the Government attempts to set aside its solemn patent. And we may here again repeat that if this is true when the suit is to set aside a patent for land, which conveys for all time the title, *a fortiori* it must be true when the suit is one to set aside a patent for an invention which only grants a temporary right.

What evidence has the Government produced? We premise by saying that there is not a scintilla of testimony as to any corruption of the officers of the department by the defendants, or any attempt at such corruption. Counsel do not

put the finger on a single fact tending to show that any money was ever paid to any official of the Patent Office, or that any undue influence was ever attempted to be exerted upon or improper suggestion made to any one. So far as the record discloses, there never was an intimation made to a single official that he could profit in any way by a moment's delay. All thought of wrong in this respect may, therefore, be put aside. If there was no corruption on the part of the defendants, what did they do that calls for condemnation? And we turn to the brief of the learned counsel for the Government to see what evidences of wrong they have found in the record. After noting that their inquiry begins at June 9, 1882, thus impliedly conceding that there is no reason to question the delay up to that time (a period of five years), they call attention to the subsequent correspondence between the solicitor in charge of the application and the officials of the department, which, so far as is material, is as follows:

"On June 9, 1882, the examiner wrote to the solicitor as follows:

'As at present advised it is believed that the claims presented may be allowed, but final action in this case must be suspended in view of probable interferences with other pending applications, which will be declared as soon as practicable.'

"On October 8, 1883, sixteen months later, the solicitor wrote as follows:

'In June, 1882, I received an official letter dated the 9th of that month, saying that "the claims presented may be allowed, but final action is suspended in view of probable interferences." Since then I have been awaiting the official action. I beg to call attention to the case and ask that it may receive action.'

"October 23, 1883, the examiner wrote as follows:

'In response to applicant's letter filed October 9, 1883, it is stated that further action in this case on the part of the office must be still further postponed until the conditions of interfering applications will permit the declaration of interference, which seems unavoidable.'

"On February 19, 1886, two years and four months later, the solicitor wrote as follows:

'The specification is hereby amended as follows: Erase amendment O, filed December 16, 1881. Erase claims 3, 7, 8, 10 and 11, and change number of claims 4, 5, 6, 7 and 9 to 3, 4, 5, 6 and 76.'

"This amendment contained nothing material to the present discussion.

"March 17, 1886, the examiner wrote as follows:

'In response to amendment of February 19, 1886, applicant is advised that the broad claims involving the idea of a variable pressure contact telephone will probably be involved in an interference with a pending application or applications of another applicant, and that said applicant has been advised that he must show that the office action taken in the matter of his application is not a sufficient answer thereto on or before the 1st of April, 1886. In the meanwhile this application will be suspended from further action.'

"August 13, 1886, five months later, the solicitor wrote:

'I desire to be informed of the present status of this case, and to be advised if the office is awaiting any action on the part of the applicant. It is desired that no rights should be lost by inaction.'

"August 19, 1886, the examiner wrote as follows:

'In response to applicant's letter of the 13th inst. he is hereby advised that the delay in this case is a matter over which he has no control, except it be, perhaps, in the matter of urging an early interference. The interference will be declared as soon as the other applicants are in condition, if it be decided that they are entitled to the same. The office is awaiting no action on the part of the applicant, and the delay is through no fault of his.'"

After these quotations, counsel observe as follows:

"These perfunctory exchanges of compliments between the solicitor and the examiner occupied the entire time from June 9, 1882, to March 16, 1888, five years nine months and seven days. In all that time not a demand for action, not a hint

even. of dissatisfaction, appears in the record.  We have quoted it all.  Of course, this appearance of willing acquies- cence is not conclusive.  The examiner's letters indicate an obstacle in the way; some portending interference or inter- ferences, always coming, yet never arriving.  But the supine submission of the company to such extraordinary delay, for such a cause, is the first item of the proof.  If it had been possessed of a real purpose to have its patent as soon as pos- sible, if it had been losing millions per annum for want of it, as the people are losing millions because of it, would it not have found some way to force this invisible foe into the field, or at least leave on the record some trace of its mighty effort to burst the bands of official routine which prevented it from finding and fighting him?"

This presents the burden of the case on the part of the Gov- ernment.  It amounts to only this: The defendant company was not active but passive.  If millions were to be added to its profit by active effort it would have been importunate and have secured this patent long before it did.  As millions came to it by reason of its being passive, it ought to suffer for its omission to be importunate.  It must keep coming before the Commissioner, like the widow before the unjust judge in the parable, until it compels the declaration, "though I fear not God nor regard man, yet, because this widow troubleth me, I will avenge her, lest by her continual coming she weary me." But is this the rule to measure the conduct of those who apply for official action?  What is the amount of the importunity which will afford protection to the grant finally obtained? How frequent must the demand be?  It is easy to say that the applications of this defendant, coming only at the inter- val of months and years, were, taken with the replies of the Patent Office, mere "perfunctory exchanges of compliments," but this does not change the fact that action was asked and repeatedly asked; that no request was made for delay, no inti- mation that it was desired or would be acceptable.

In this connection may well be noticed the letter of the solicitor, in March, 1881, to the Commissioner, in which he urged the modification of Rule No. 94 in respect to interfer-

ences, and this in order to hasten the issue of the patent. In this letter, besides pointing out how the rule as it then existed would tend to delay, he adds these statements:

" So far as my client is concerned, I have to submit that it is of the utmost importance that the interference be declared forthwith. . . .

" The indefinite suspension of the interference would only create harassing and oppressive claims after the public had become possessed of the invention without hinderance or objection on the part of the inventor, and it is but just to say that neither of the interfering applicants could with any degree of propriety claim to be the inventor and expect that such notice on his part would be treated by the public with any degree of respect. Patents issued as the result of long pending interferences are always looked upon as odious monopolies because of the manner in which they are enforced at the time when the public were already possessed of the invention. . . .

" . . . An early decision upon the question submitted is earnestly requested."

It may be added that the modification was made in October, 1881.

In respect to this letter, and especially the second paragraph, quoted above, counsel for the Government say:

" In the argument below, counsel appeared to think that once was enough, and that they stood as a perpetual exhortation to duty to the examiner and all his successors as though they had been nailed on his office door. But they were not even in the file of the Berliner case. Examiner Freeman, whose report was endorsed on the letter, went out of office in 1883. If any one ever saw it after that until it was exhumed for the purpose of this case, the fact does not appear in the record."

But is the applicant to be condemned because, having once made an urgent request for action and pointed out reasons therefor, it was not continually repeating that request, because it did not see that such request was placed on the files of this particular application, or, as intimated in the words of counsel, nailed on the doors of the Patent Office?

It is, of course, easy to say that these applications, these suggestions and requests meant nothing; that they were a mere blind; but something more than assertion of counsel is necessary to destroy their significance, or to establish collusion between the applicant and the officials of the department. But the case does not stand upon the fact that the formal communications from the solicitor in charge of this application were few in number. While in every one, in which the matter was referred to, there was a request for action, it also appears from the testimony of Messrs. Freeman, Lyons and Kintner, who were the examiners in charge during the major portion of the time in dispute, that the representatives of the Bell Company were urgent in pushing the Berliner application. For instance, Examiner Lyons testified:

"They were urgent and persistent beyond toleration. Hardly a day passed without somebody representing the interests of the Bell Telephone Company coming to our room and urging the allowance of the Berliner case, or the declaration of interferences. I myself was waylaid in the halls of the Patent Office, and on more than one occasion did I sneak into the room to avoid being bored by Mr. Charlie Hedrick, the assistant of Mr. Pollok. Mr. Pollok himself, also, although less frequently, came to the room, and later on, notably toward the end of 1884, and in the spring and summer of 1885, Mr. W. W. Swan was a frequent visitor in the electrical division."

And Examiner Kintner (who was in office from May, 1883, to April, 1887), in reply to a question as to what Mr. Swan, one of the representatives of the telephone company, did in respect to the application, said:

"I had a great many interviews with him in the matter of both the Edison and the Berliner applications under consideration, and he was very persistent in urging the passage of both applications to patent; in fact, to such an extent that his persistency annoyed me not a little."

Another matter referred to by counsel is what they call the "tacit understanding." The facts are these: One Daniel Drawbaugh claimed to have invented the telephone prior to

Bell. He assigned his inventions to the People's Telephone Company, between whom and the defendant company a heated and protracted litigation arose. Now, it is said that there was an agreement, or, at least, a tacit understanding, between the officials of the Patent Office, the People's Company and the defendant company that the proceedings in the Patent Office in respect to the Berliner application should wait the determination of the litigation between the two telephone companies. It is insisted that the officials had no right to enter into such an agreement; that it was unlawful in its character. Assuming that this is so, still the fact appears that the proposition therefor came from the representatives of the Drawbaugh interest, that it was deemed by the officers of the Patent Office to be for the best interests of all, and that it was simply assented to by the defendant. Nowhere does it appear that the defendant urged, or even suggested, the propriety of such a delay. For the present we do not consider the wisdom or the rightfulness of the course pursued. All that we desire to notice is that it was not at the instance of the defendant.

It is further said that, even if there were at first any excuse for such "tacit understanding," and the Patent Office properly delayed action on this application until after the litigation between Drawbaugh and Bell had ended, a judgment therein was rendered in the Circuit Court in 1884; and that then the office should have proceeded promptly, and that there was no excuse for waiting until the decision of the appeal by this court in 1888; and least of all for any delay after that final decision by this court.

Summing up their argument on this branch of the case counsel say:

"The review of the history of the Berliner application which we have now completed shows that in its treatment of it the office proceeded upon two unlawful assumptions.

"The first was that an applicant, whose application is ready for issue except for a possible threatened interference, must wait until the antagonizing application is either found allowable and ready for the interference, or finally ejected from

the office, no matter how long that may be.    This assumption governed the action of the examiners from 1882 to the issue of the patent.    .  .  .

"The second assumption was that the judicial determination of the question of Drawbaugh's invention, in the suit between the owners of the applications, was not enough to warrant action by the office.    Examiner Kintner took the ground, in conversation with Mr. Swan — never on the record — that the decision of the Circuit Court was not enough for him; that the case might be appealed, and he would act only on the decision of the Supreme Court.    But when that came, it received no more consideration than had been given to that of the Circuit Court."

Were it conceded that these two assumptions were "false assumptions," as counsel call them, what are they but errors of judgment on the part of the patent officials as to the course of procedure; and can it be possible that an applicant for a right, who has under the statute no choice of tribunals or course of procedure, but is compelled to apply to one tribunal which has exclusive jurisdiction in the matter, and must abide by its rulings as to procedure, can be held to have forfeited his right simply because of errors of judgment by such tribunal as to the procedure?    The statement of the question seems to us to carry its own answer.    It is true counsel follow this declaration of the errors on the part of the office in the matter of procedure with the further statement:

"The guilty party is the Bell Company.    It had a full and perfect inside view of the whole situation from the beginning. Its attorneys were wiser in these things than the commissioners or the examiners.    They shrewdly availed themselves of every unauthorized usage, mistaken assumption, ignorant misconception or supposed obstacle, by means of which the issue of the patent could be delayed without apparent responsibility on their part.    In view of the duty which rested upon the company to speed the application, that was fraud, not less but more reprehensible because it was not of the common and gross kind, but so refined and acute that its garb of professed innocence has deceived even the Court of Appeals."

The difficulty with this charge of wrong is that it is not proved. It assumes the existence of a knowledge which no one had; of an intention which is not shown. It treats every written communication from the solicitor in charge of the application, calling for action, as a pretence, and all the oral and urgent appeals for promptness as in fact mere invitations to delay. It not only rejects the testimony which is given, both oral and written, as false, but asks that it be held to prove just the reverse.

Indeed, the case which the counsel present to us may be summed up in these words: The application for this patent was duly filed. The Patent Office after the filing had full jurisdiction over the procedure; the applicant had no control over its action. We have been unable to offer a syllable of testimony tending to show that the applicant ever in any way corrupted or attempted to corrupt any of the officials of the department. We have been unable to show that any delay or postponement was made at the instance or on the suggestion of the applicant. Every communication that it made during those years carried with it a request for action; yet because the delay has resulted in enlarged profits to the applicant, and the fact that it would so result ought to have been known to it, it must be assumed that in some way it did cause the delay, and having so caused the delay ought to suffer therefor. There is seldom presented a case in which there is such an absolute and total failure of proof of wrong.

The defendant company might safely have left the case here, but it has not been content to rest the controversy with the failure on the part of the Government to show any wrong. It has not been content to accept the Scotch verdict of "not proven." It has called as witnesses the examiners who were in charge of this application, and taken their testimony as to what did in fact take place, and as to how and why the long delay occurred. Whatever judgment may be pronounced upon the wisdom of the course pursued by these officials, or the sufficiency of the reasons given by them therefor, there is no ground for controverting that they acted in good faith. The case is not one of arbitrary, peremptory postponements and delay.

They supposed they were acting in compliance with the rules of the Patent Office, and out of proper regard for the rights of conflicting interests. No just estimate can be placed upon the propriety of their conduct without taking into consideration the whole subject of telephonic inventions and litigation. As heretofore stated, and as is well known, Bell claimed to be the pioneer in this matter of telephonic communication. His claim was disputed, and out of that dispute came the most important, the most protracted litigation which has arisen under the patent system in this country. For years this litigation was pending in the trial courts, subsequently brought to this court, and finally decided in 1888. So great was this litigation, so immense the volume of testimony, and so important the rights involved, that it is the only case in the history of this court to which an entire volume of our reports is devoted. (126 U. S.) The argument was protracted through weeks, and the case was held under consideration for a year, and finally decided by a closely divided court. Is it strange that, when the primary right was being so vigorously contested, and was so much a matter of doubt, when (as appears from the testimony in this case) the judgment of the law department of the Government was adverse to the claims of Bell, and to the validity of the patent which he had obtained — is it strange, we ask, in view of these facts, that the disposition of the apparently minor matter should be held in abeyance in the Patent Office until a final decision of the primary right?

Neither can any just estimate be placed upon their conduct without taking into account the volume of business, and the pressure on account thereof, in the Patent Office. Beyond the fact, which is a matter of common knowledge, that thousands of applications are filed and thousands of patents granted each year, the record discloses something as to the multitude of applications for patents for telephones and telephonic devices which were pending during these years. Mr. Townsend, who was an examiner up to November 15, 1880, while unable to state the number of applications, was able to say that he had examined over 120 that went to

patent. This it will be remembered was in the early days of telephonic investigation and invention. It appears also from a communication made by the Commissioner of Patents to the Secretary of the Interior, on December 13, 1892, advising against this suit, that at that time a gentleman, who is called in the letter the "relator," had pending in the Patent Office 152 applications for patents on telephones and telephone systems. These facts may be only side lights, but they show that the examiners and other officials in the Patent Office had something else to do besides considering this application.

Of course, it is easy to say that the Patent Office could have disposed of this application more promptly than it did; that it ought to have done so, and that, in view of the termination of the great litigation favorably to the claims of Bell, its delay has resulted in large pecuniary benefits to the defendant company. But a wisdom born after the event is the cheapest of all wisdom. Anybody could have discovered America after 1492. The question is not whether a better judgment on the part of the patent officials would have disposed of this application long before it was, is not indeed whether there was any error of judgment, but whether they acted wrongfully and their action was induced by or at the instance of the defendant company.

One thing more deserves notice. The argument of the counsel for the Government proceeds all along on the assumption of the superior knowledge of the representatives of the defendant company; that they saw the end from the beginning; that they knew that their client had an invention which was patentable and that they would ultimately obtain a patent therefor, and also that Bell was and would finally be adjudged the primary inventor of the telephone, and that possessed of all this knowledge they planned the delay in securing the Berliner patent in order that thereby they might extend to the termination of its life the telephone monopoly. But what an assumption this is and how illy justified by the facts! The very process and termination of the Bell-Drawbaugh litigation demonstrates the doubtfulness of the question there in issue, and is absolute evidence that there was up to the close

of that litigation an uncertainty as to the result. Equally uncertain was the outcome of the Berliner application. Indeed, there is an uncertainty as to every application. No one can foretell what will be the judgment of the Patent Office upon the questions of novelty and utility. And in respect to this Berliner application the matters which are subsequently to be considered attest that there was more than ordinary doubt as to the outcome. On account of those matters it is earnestly contended that there was no merit in the application, and that it ought to have been denied. Further than that, they knew that the officials of the Patent Office were subject to change — as in fact they were changed during the pendency of these proceedings — and even if they had any direct intimations from the first examiner or the first commissioner, there was no certainty that a subsequent examiner and subsequent commissioner would entertain the same views. If the Bell-Drawbaugh litigation had terminated the other way and a different opinion on the part of a single member of this court would have changed this result, or if when the time came the Commissioner of the Patent Office had decided against the Berliner application, and his decision been sustained on appeal to the Supreme Court of the District of Columbia, then all this brilliant scheme of realizing millions would have vanished into thin air. If they were possessed of the wisdom which the Government attributes to them, the representatives of the Bell Company must have realized that the certainty which attends a final decision and the issue of a patent was something worth striving for, and not likely to be ignored. And if this underlying assumption has so little foundation, what shall be said of an inference and an imputation unsupported by evidence and based upon that assumption?

Our conclusions on this branch of the case are: First, that before the Government is entitled to a decree cancelling a patent for an invention on the ground that it had been fraudulently and wrongfully obtained, it must, as in the case of a like suit to set aside a patent for land, establish the fraud and the wrong by testimony which is clear, convincing and satisfactory. Second, that Congress has established a department

with officials selected by the Government, to whom all applications for patents must be made; has prescribed the terms and conditions of such applications, and entrusted the entire management of affairs of the department to those officials; that when an applicant for a patent complies with the terms and conditions prescribed and files his application with the officers of the department he must abide their action, and cannot be held to suffer or lose rights by reason of any delay on the part of those officials, whether reasonable or unreasonable, unless such delay has been brought about through his corruption of the officials, or through his inducement, or at his instance. Proof that they were in fault, that they acted unwisely, unreasonably and even that they were culpably dilatory, casts no blame on him and abridges none of his rights. Third, the evidence in this case does not in the least degree tend to show any corruption by the applicant of any of the officials of the department, or any undue or improper influence exerted or attempted to be exerted by it upon them, and on the other hand does affirmatively show that it urged promptness on the part of the officials of the department, and that the delay was the result of the action of those officials. And, fourth, if the circumstances do not make it clear that this delay on the part of the officials was wholly justified they do show that it was not wholly unwarranted, and that there were reasons for the action of such officials, which at least deserve consideration and cannot be condemned as trivial.

The three remaining grounds of relief asserted by the Government may be considered together. Defendants contend that as the last two, although urged in the Circuit Court, were not presented to the Court of Appeals (referring for this fact to the opinion of the latter court and also a notice which was contained in the brief of counsel for the Government), we are precluded from noticing them, citing as authority *Bell* v. *Bruen*, 1 How. 169; *Alviso* v. *United States*, 8 Wall. 337; *National Bank* v. *Commonwealth*, 9 Wall. 353; *Rogers* v. *Ritter*, 12 Wall. 317; *Klein* v. *Russell*, 19 Wall. 433; *Supervisors* v. *Lackawana Iron & Coal Co.*, 93 U. S. 619; *Wilson* v. *McNamee*, 102 U. S. 572; *Wood* v. *Weimar*, 104 U. S. 786; *Top-*

*liff* v. *Topliff*, 145 U. S. 156; *McGahan* v. *Bank of Rondout*, 156 U. S. 218, and *Carr* v. *Fife*, 156 U. S. 494, in which cases, with more or less particularity, the proposition is announced that this court will not consider questions not presented to and passed upon by the lower court. We deem it unnecessary to determine how far that rule is applicable in this case, for the reasons which compel us to deny relief on the first of these grounds are, when applied to the facts developed by the testimony, equally potent as to the others. That ground, as stated, is "that a patent issued November 2, 1880, upon a division of the original application covers the same invention as that covered by the patent in suit and exhausted the power of the Commissioner as to that invention." The patent of 1880 is for a receiver; that of 1891 for a transmitter. It is claimed that the two instruments are alike in form and alike in function, save as they are operated at different ends of the telephone wire. The transmitter can be placed at the other end of the wire and then becomes a receiver, and so *vice versa.* Popularly speaking, it may be said that the transmitter takes the varying sounds of the human voice and passes them on to the telephone wire, to be borne along thereon by the undulatory electric current until they reach the receiver, which takes and passes them to the human ear. In a sense the receiver is also a transmitter, for it passes the sounds from the wire to the ear. We agree with the Court of Appeals that it is unnecessary to determine whether there are two separate inventions in the transmitter and the receiver, or whether the patent of 1891 is for an invention which was covered by the patent of 1880. The judgment of the Patent Office, the tribunal established by Congress to determine such questions, was adverse to the contention of the Government, and such judgment cannot be reviewed in this suit.

Suits may be maintained by the Government in its own courts to set aside one of its patents not only when it has a proprietary and pecuniary interest in the result, but also when it is necessary in order to enable it to discharge its obligations to the public, and sometimes when the purpose and effect are simply to enforce the rights of an individual. In

the former cases it has all the privileges and rights of a sovereign. The statutes of limitation do not run against it. The laches of its own officials does not debar its right. *Van Brocklin* v. *Tennessee*, 117 U. S. 151; *United States* v. *Nashville, Chattanooga &c. Railway*, 118 U. S. 120; *United States* v. *Insley*, 130 U. S. 263. But when it has no proprietary or pecuniary result in the setting aside of the patent; is not seeking to discharge its obligations to the public; when it has brought the suit simply to help an individual; making itself, as it were, the instrument by which the right of that individual against the patentee can be established, then it becomes subject to the rules governing like suits between private litigants. As said in *United States* v. *Beebe*, 127 U. S. 338, 347:

"We are of the opinion that when the Government is a mere formal complainant in a suit, not for the purpose of asserting any public right or protecting any public interest, title or property, but merely to form a conduit through which one private person can conduct litigation against another private person, a court of equity will not be restrained from administering the equities existing between the real parties by any exemption of the Government designed for the protection of the rights of the United States alone. The mere use of its name in a suit for the benefit of a private suitor cannot extend its immunity as a sovereign government to said private suitor, whereby he can avoid and escape the scrutiny of a court of equity into the matters pleaded against him by the other party; nor stop the court from examining into and deciding the case according to the principles governing courts of equity in like cases between private litigants." See also *United States* v. *Des Moines Navigation & Railway Co.*, 142 U. S. 510; *Curtner* v. *United States*, 149 U. S. 662.

Now, in the case at bar the United States has no proprietary or pecuniary interest. The result, if favorable to it, would put no money in its treasury or property in its possession. It has a standing in court either in the discharge of its obligation to protect the public against a monopoly it has wrongfully created, or simply because it owes a duty to other patentees to secure to them the full enjoyment of the rights which it

has conferred by its patents to them. Perhaps both of these objects were in view. In so far as the latter was and is the purpose of this suit it brings it within the rule laid down in United States v. Beebe, supra. Doubtless the removal from the public of the burden of a monopoly charged to have been wrongfully created was also one of the objects, and perhaps, the principal object. United States v. American Bell Telephone Co., 159 U. S. 548. To what extent this may relieve the Government as suitor from all the rules governing the suits of private individuals need not be specifically determined here.

One of the familiar rules of equity, reinforced by statute (§ 723, Rev. Stat.), is that "suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate and complete remedy may be had at law." The objection to the validity of this patent on the ground that it was already covered by the patent of 1880 is a defence which, under the statutes (§ 4920, Rev. Stat.), is open to every individual charged by the patentee with infringement, whether the proceeding against him be an action at law or a suit in equity. The Government, therefore, if seeking simply to protect the right of an individual, ought not to be permitted to maintain a suit in equity to cancel that against which the individual has a perfect legal defence available in any action brought by or against him. The query is pressed whether the same rule would not also apply when the Government is only seeking to protect the public at large, for the public is but the aggregation of all the individuals, and if each of them has a perfect defence to the patent, so all, together, have. Again, and as an illustration perhaps of the extent of the rule referred to, it has often been held that while one having the title to and possession of a tract of land can maintain a suit in equity to cancel a deed or other instrument which is a cloud upon the title, such suit cannot be sustained if the deed or instrument is void upon its face, its invalidity resting upon matters of record, and not being affected by any lapse of time or statute of limitations. In other words, the deed or instrument is not considered a

cloud if it can never be used to destroy his title or disturb his possession. The objection to this patent on the ground stated is an objection resting upon matters of record — of record in the Patent Office; not dependent on oral testimony nor subject to change, and in no way affected by lapse of time. Within the scope of this specific application of the general rule it would seem that equity has no jurisdiction either at the suit of the Government or of an individual to formally cancel that which by record and unfailing evidence is, as claimed, absolutely void.

But, further, Congress has established the Patent Office, and thereby created a tribunal to pass upon all questions of novelty and utility. It has given to that office exclusive jurisdiction in the first instance, and has specifically provided under what circumstances its decisions may be reviewed, either collaterally or by appeal. As said in *Butterworth* v. *Hoe,* 112 U. S. 50, 67: "That it was intended that the Commissioner of Patents, in issuing or withholding patents, in reissues, interferences and extensions, should exercise quasijudicial functions, is apparent from the nature of the examinations and decisions he is required to make, and the modes provided by law, according to which, exclusively, they may be reviewed."

Sections 4911 to 4914, Rev. Stat., grant appeals in certain cases to the Supreme Court of the District of Columbia. It is true those sections do not authorize appeals on behalf of the Government, but the failure so to do may be evidence that Congress thought the Government ought not to interfere; and because it believed it had made ample provision for securing the rights of all without the intervention of the Government. Section 4915, Rev. Stat., authorizes a suit in equity on behalf of an applicant for a patent whose application has been refused. *Morgan* v. *Daniels,* 153 U. S. 120, presented a controversy under that section, and in the opinion, on page 124, we said: "It is a controversy between two individuals over a question of fact which has once been settled by a special tribunal, entrusted with full power in the premises. As such it might be well argued, were it not for the terms of this

statute, that the decision of the Patent Office was a finality upon every matter of fact."

It is true that all these sections refer to proceedings between individuals, but the Government is as much bound by the laws of Congress as an individual, and when Congress has created a tribunal to which it has given exclusive determination in the first instance of certain questions of fact and has specifically provided under what circumstances that determination may be reviewed by the courts, the argument is a forcible one that such determination should be held conclusive upon the Government, subject to the same limitations as apply in suits between individuals.

There is nothing in *United States* v. *Bell Telephone Company*, 128 U. S. 315, and *United States* v. *American Bell Telephone Company*, 159 U. S. 548, to conflict with the views above expressed. In the former case the question presented was whether the Government could maintain a bill to set aside a patent for an invention on the ground of fraud in its issue, and among the objections urged was the fact that Congress had, in § 4920, Rev. Stat., made specific provision for certain defences in suits by an infringer. It was held that the Government could maintain such a bill, and that these special statutory provisions did not defeat its right, the court summing up the discussion in these words (p. 373):

" The argument need not be further extended. There is nothing in these provisions expressing an intention of limiting the power of the Government of the United States to get rid of a patent obtained from it by fraud and deceit. And although the legislature may have given to private individuals a more limited form of relief, by way of defence to an action by the patentee, we think the argument that this was intended to supersede the affirmative relief to which the United States is entitled, to obtain a cancellation or vacation of an instrument obtained from it by fraud, an instrument which affects the whole public whose protection from such a fraud is eminently the duty of the United States, is not sound."

In the latter case, which is the one now before us, there

was decided a motion to dismiss for want of jurisdiction in this court of an appeal from the decision of the Court of Appeals, and it was adjudged that this court had jurisdiction. It is true, at the close of the opinion is found this general statement as to the power to maintain such a suit (p. 555):

"In *United States* v. *Telephone Co., supra,* it was decided that where a patent for a grant of any kind issued by the United States has been obtained by fraud, by mistake or by accident, a suit by the United States against the patentee is the proper remedy for relief, and that in this country, where there is no kingly prerogative, but where patents for land and inventions are issued by the authority of the Government, and by officers appointed for that purpose, who may have been imposed upon by fraud or deceit, or may have erred as to their power, or made mistakes in the instrument itself, the appropriate remedy is by proceedings by the United States against the patentee."

But while there was thus rightfully affirmed the power of the Government to proceed by suit in equity against one who had wrongfully obtained a patent for land or for an invention, there was no attempt to define the character of the fraud, or deceit or mistake, or the extent of the error as to power which must be established before a decree could be entered cancelling the patent. It was not affirmed that proof of any fraud, or deceit, or the existence of any error on the part of the officers as to the extent of their power, or that any mistake in the instrument was sufficient to justify a decree of cancellation. Least of all was it intended to be affirmed that the courts of the United States, sitting as courts of equity, could entertain jurisdiction of a suit by the United States to set aside a patent for an invention on the mere ground of error of judgment on the part of the patent officials. That would be an attempt on the part of the courts in collateral attack to exercise an appellate jurisdiction over the decisions of the Patent Office, although no appellate jurisdiction has been by the statutes conferred. We are of opinion, therefore, that the question, as stated, is not open for consideration in

this case.  We see no error in the decision of the Court of
Appeals, and its decree, dismissing the bill, is

*Affirmed.*

Mr. Justice Harlan dissented.

Mr. Justice Gray and Mr. Justice Brown were not present
at the argument, and took no part in the decision.