WESTERN ELECTRIC CO. et al. v. FOWLER.

(Circuit Court of Appeals, Seventh Circuit. January 4, 1910.)

No. 1,593.

1. PATENTS (§ 112*)—SUIT TO OBTAIN PATENT—MEASURE OF PROOF.

In a suit under Rev. St. § 4915 (U. S. Comp. St. 1901, p. 3392), by an unsuccessful applicant for a patent to establish his right, where in interference proceedings before the Patent Office between complainant and defendant all of the examiners who passed upon the matter, the Commissioner, and the Court of Appeals for the District of Columbia concurred in adjudging priority of invention to defendant, who was awarded a patent, such judgments can only be overcome by clear and convincing proof, which strongly outweighs that of the other side in the interference proceedings.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 162–165; Dec. Dig. § 112.*]

2. PATENTS (§ 112*)—SUIT TO OBTAIN PATENT—MEASURE OF PROOF.

Evidence considered, and held insufficient to overcome the judgments of the Patent Office and the Court of Appeals for the District of Columbia, in interference proceedings, on which the McBerty patent, No. 817,867, for apparatus for telephone switchboards, was granted.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 162–165; Dec. Dig. § 112.*]

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by Samuel B. Fowler against Western Electric Company and Frank R. McBerty. Decree for complainant, and defendants appeal. Reversed.

The bill in the Court below was to secure a patent for an invention relating to a telephone exchange system, notwithstanding the adverse action of the Patent Office and the Court of Appeals for the District of Columbia in interference proceedings. The bill was under section 4915 of the Revised Statutes (U. S. Comp. St. 1901, p. 3392), resulting in a decree finding that appellee was entitled to receive letters patent of the United States upon his claims set forth in his application, serial number 116,086, filed July 18th, 1902, and that claims Nos. 7, 8, 9, 10 and 11, contained in patent No. 817,867, issued to appellant Western Electric Company, as assignee of Frank R. McBerty, April 17th, 1906, and any other claims in said patent substantially like these, are null and void and of no avail. The facts are stated in the opinion.

George P. Barton, De Witt C. Tanner, and George E. Folk, for appellants.

Charles A. Brown and Lynn A. Williams, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

GROSSCUP, Circuit Judge, delivered the opinion.

Section 4915, Revised Statutes of the United States, reads as follows:

"Sec. 4915. Whenever a patent on application is refused, either by the Commissioner of Patents or by the supreme court of the District of Columbia upon appeal from the Commissioner, the applicant may have remedy by bill in equity: and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof. as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the Commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and otherwise complying with the requirements of law. In all cases, where there is no opposing party, a copy of the bill shall be served on the Commissioner; and all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not."

In the interference proceedings, the respective rights of McBerty and Fowler to the issuance of a patent, were examined in succession by the Examiner of Interferences, the Board of Examiners in Chief, the Commissioner of Patents, and the Court of Appeals for the District of Columbia; and in each tribunal judgment of priority of invention was in favor of McBerty. To overcome these judgments, the proof must be clear and convincing—by evidence which shall strongly outweigh that of the respondent below, as put by Judge Putnam—Brooks v. Sacks, 81 Fed. 403, 26 C. C. A. 456. Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772. 38 L. Ed. 657; United States v. Bell Telephone Company, 167 U. S. 224, 17 Sup. Ct. 809, 42 L. Ed. 144. Have appellees made out a case that is clear and convincing? Have they submitted proof in favor of their claim of priority that strongly outweighs the proofs on the other side?

Upon parties coming into interference in the Patent Office, there is forwarded to each notice thereof, together with a designation of the time within which preliminary statements shall be filed. The preliminary statement must be under oath and must show the following facts:

"(1) The date of original conception of the invention set forth in the declaration of interference.

"(2) The date upon which a drawing of the invention was made.

"(3) The date upon which a model of the invention was made.

"(4) The date upon which the invention was first disclosed to others.

"(5) The date of the reduction to practice of the invention.

"(6) A statement showing the extent of use of the invention."

The following caution is contained in the rule:

"The preliminary statements should be carefully prepared, as the parties will be strictly held in their proofs to the dates set up therein.

"If a party prove any date earlier than alleged in his preliminary statement, such proof will be held to establish the date alleged and none other.

"The statement must be sealed up before filing (to be opened only by the Examiner of Interferences; see Rule 111), and the name of the party filing it, the title of the case. and the subject of the invention indicated on the envelope. The envelope should contain nothing but this statement."

Rule 111 is as follows:

"111. The preliminary statements shall not be opened to the inspection of the opposing parties until each one shall have been filed, or the time for such filing, with any extension thereof, shall have expired, and not then unless they have been examined by the proper officer and found to be satisfactory.

"Any party in default in filing his preliminary statement shall not have access to the preliminary statement or statements of his opponent or opponents until he has either filed his statement or waived his right thereto, and agreed to stand upon his record date."

Manifestly, the purpose of these rules was to draw from each applicant both an honest and a carefully ascertained statement of facts bearing upon his claim of priority—a statement unaffected by any knowledge that he otherwise might have of his rival's claim. And presumptively, a statement thus submitted, embodies not only the applicant's knowledge most favorable to himself, but a knowledge that has been carefully scrutinized and guarded by his legal advisers, especially when, as in this case, his advisers are among the most competent attorneys practicing the patent law.

Pursuant to this practice, appellee submitted a statement to the effect that he conceived the invention involved in the interference and made drawings thereof in the early part of December, 1900; disclosed the invention to others about the middle of March, 1901; made no model of the invention; but reduced the invention to practice in the early part of June, 1901. The invention has gone into extensive use.

McBerty stated that he conceived the invention July 16, 1896, and on that day made a drawing thereof; disclosed this invention to others September 9th, 1896; and made a model of the invention on or about May 29, 1901, reducing the invention to practice on that day. On the face of these statements, priority of invention was with McBerty. Thereupon, Fowler made his first effort to mend his hold. It took the form of a motion to amend his statement, whereby reduction to practice would be carried back to the middle of March, 1901. This motion was denied, but testimony was admitted to support the proposed amendment—the testimony of Fowler, Doolittle, Hulburd, Denig and Marack, the last four all connected with the Sterling Electric Company—the President of the Company, one Cook, not having been called as a witness; upon consideration whereof (the testimony of the witnesses being fully discussed in the opinion), judgment of priority went to McBerty. In due course, appeals were taken to the Examiner in Chief and to the Commissioner, on each of which appeals the testimony was discussed and considered, the preceding judgment being, in each case, affirmed. Thereupon, the matter was appealed to the Court of Appeals for the District of Columbia, upon the same evidence, and with the same result.

This suit is appellee's second effort to mend his hold. It is based, so far as evidence goes, upon an amplification of the testimony of the witnesses heard before, with the addition thereto of the testimony of other witnesses. To put our finger upon the concrete matter upon which the testimony of these witnesses differs here from what it was before, and to clear up which the testimony of additional witnesses is offered here, requires that the nature of the invention be brought into

view, and the particular respects in which it differed from the similar preceding or contemporaneous inventions in the same field.

The state of the art was before this Court in Western Electric Company v. Galesburg Union Telephone Company and Howard Knowles, 144 Fed. 684, 75 C. C. A. 500. The patent involved in that suit was No. 669,708, issued March 12, 1901, to Charles E. Scribner, and the alleged infringing device was what was known as the Galesburg System, a system that embodied the invention here involved. In the opinion in that case, the essential differences between the patent of March 12, 1901, including the preceding art, and the system subsequently embodied in the Galesburg system, were carefully pointed out. "Theoretically," says the opinion, respecting the patent of March 12, 1901, and the preceding art, "an equal division of current cuts such current into halves. But practically, the current being divided, the resistance is so diminished that each line of the divided circuit gets considerably more than one-half of the current massed. The effect of this is, that there is not such a wide difference between the luminosity of the lamp fed by the current massed and the current divided, as the inventor perhaps anticipated; so that, accessory to making the signals practical, these three things at least were added: The lamp was covered with a lense, not solely for radiating the light, but to partially smother it; the uniformity of the lamps had to be maintained —that is, the lamps not only had to be uniform when put in, but replaced the moment that, through use, a difference in uniformity developed; and the batteries had to be kept at a given voltage—a variation of voltage or diminution of the flow, destroying the fine balance upon which alone the luminosity and non-luminosity of the lamps are maintained. That these defects were actual is shown by the fact that the patent in suit (the patent of March 12, 1901) has not gone into general use."

On the contrary, the Galesburg system (the system embodying the invention here involved) the opinion points out "employs the device of a signaling lamp associated with a supervisory lamp, each being on a circuit alone at times, and both upon a circuit together at times, with the result, that when each is on the circuit alone it is a signal, but when both are on the circuit at once, neither is a signal; together with the resistance coils, spring jacks, connecting plugs and the like, that mechanically bring this about."

In connection with diagrams published in the opinion, the exact operation of the Galesburg system is then pointed out, followed by a statement of the differences between it and the preceding art, including the Scribner patent of March 12, 1901, as follows:

"The patent in suit [the Scribner patent of March 12, 1901] employs a single predetermined pitch of current, as it reaches the lamps through resistance, m, and would operate under no other conditions; the appellees' system carries a current varying according to the lamps to be lighted, and would operate under no other condition. The patent in suit provides for extinguishment by an approximately equal division of the current, and looks in pursuit of this purpose to no other provision; the appellees' system provides for extinguishment of the line lamp by practically short circuiting, and the supervisory lamp by a high candle power, and would operate in no other way. The patent in suit involves the necessity of lamps of identical character—lamps so delicately

matched that in dividing the current, the flow through each lamp will be equal —and the patent in suit would operate under no other conditions; the appellees' system employs lamps so differing from each other in character, that any close balancing of the lamps is a matter that is not involved. In the patent in suit, the current must be pitched to almost an exact predetermined point —involving battery action constantly up to a certain point, and a resistance that is constant; the operation of appellees' system cannot be said to hinge in the least, upon pitch of current."

These differences we held to be fundamental. "They mark," we said, "two substantially differing lines of thought. And they have resulted in two distinct signaling systems, in the one of which the defects in the other have been escaped chiefly by avoiding all in it that was new, while readapting certain things in it that were old."

Now, the concrete question of fact in the Patent Office and in the Court of Appeals of the District of Columbia in the interference proceedings—the crux of the whole inquiry, so far as it was an inquiry of fact—was whether, in the disclosures said to have been made by Fowler in March, 1901, and said to have been contemplated in the so-called Houston system, Fowler was disclosing, as an already worked out invention, what afterward went into the Galesburg system, or whether he was disclosing only the prior art above mentioned, including the Scribner patent of March 12, 1901, with the improvements thereon, toward which he was, at that time, still groping in the dark. This question of fact was thus a question of identity—the exact identification of a concept among other concepts closely resembling it. And the way to establish such identity, was to find and set forth the ear marks that distinguished this conception, if it then existed, from the existent resembling conceptions; the chief of those ear marks being the differing voltage between the signal and the supervisory lamps in the invention here involved.

Now, there is no explanation in the record of why, knowing that he was in interference with a rival, Fowler forgot, when he made up his preliminary statement, that his patent was reduced to practice before June, 1901. He was advised then by the lawyers who are representing him now. Why was a fact, so important in an interference contest, so completely overlooked? Nor is there any explanation of why the witnesses, called in the Patent Office and before the Court of Appeals to prove disclosures in March and April, 1901, were not brought down to a satisfactory identification of the invention said to have been disclosed; for it is admitted, that in their testimony in the Patent Office and before the Court of Appeals of the District of Columbia, the identity of the invention was not, with sufficient certainty, described. But why not? The identity of the invention, alleged to have been then disclosed, was the turning point there as here—why could not the witnesses then, as now, be brought to speak with certainty upon the turning point? The issue then was as sharply drawn as the issue is now; counsel then are counsel now; and a successful outcome then was important enough to justify an expensive contest—why was the identity of the invention, the turning point in the controversy, slurred over? And how comes it that the testimony of these witnesses, at this later date, comes out with so much greater definiteness than it came out at the earlier date, when, under ordinary circumstances, the event, being

much more recent, ought to have been fresher in the witnesses' minds?

These questions are not answered in the record before us, nor are they made less pertinent by the character of the new testimony before us. The new testimony, so far as it is that of the recollection of the new witnesses, simply shows what is also new in the recollection of the old witnesses, to-wit, an attempt now to ear mark, after the lapse of five years, as belonging to the disclosures of March and April, what a few months later became established facts; testimony thus resting wholly in memory, and brought forth under circumstances showing that after repeated failures to meet the issue at this point, the strain of thus meeting it fell imperatively upon the preparation for the later hearings. Testimony, thus circumstanced, is not convincing. Besides, the testimony of these witnesses does not, even now, satisfactorily show that they comprehend the departure of the invention here involved from the prior art. And Cook, president of the Sterling Electric Company, as late as August 28, 1901, stated:

"We have not as yet got one of these boards in operation and until that time arrives, it must be considered as in the nature of an experiment."

Nor are there any contemporaneous facts or circumstances that support this new testimony. The only ones proffered are (1) an original order book in triplicate (the portion submitted being a carbon copy). The other pages of this book are gone, and the material matter is on, not a carbon copy, but a typewritten strip—the only typewritten matter in the whole book, save one, relating also to the Houston plant. Now, that is not a contemporaneous fact or circumstance; because the party to the suit (and this book has been in the possession of one of the appellees) may have himself, in view of creating this evidence, subsequently manufactured or attached it. The other (2) is an order book also, said to be a contemporaneous confirmatory circumstance, because of an addenda to an order for line signals for the Houston plant, wherein it is stated that "some additional lamps for the cord circuit will be required, but voltage is not yet determined"; showing, it is said, that there was to have been a different voltage in the supervisory from the signal lamps. But this by no means follows. The reference may have been to a number of other things besides the signal lamps. Indeed, outside the memory testimony, nothing is before us tending to establish appellee's contention.

Upon the whole case, therefore, the testimony submitted to us fails to convince us (and that must be our state of mind upon the evidence before us, before this decree can be affirmed) that there was any disclosures by Fowler prior to May 29, 1901, the date of McBerty's reduction to practice. Nor is there anything in the record showing that the time elapsing between May 29, 1901, and the application of McBerty for a patent, January 24th, 1902, is an unreasonable delay. Indeed, in the absence of anything especially spurring an inventor on, delays of that length are not unusual; and we cannot impose upon McBerty the duty of responding to a spur, of which, at that time, he had no knowledge.

The decree of the Circuit Court is reversed and the case remanded, with instructions to dismiss the bill for want of equity.