**THOMAS KERFOOT & CO., Limited, v. LOUIS K. LIGGETT CO.**

No. 3247.

District Court, D. Massachusetts.

May 21, 1932.

Mock & Blum, of New York City, and Arthur P. Hardy, of Boston, Mass., for plaintiff.

Gaston, Snow, Saltonstall & Hunt, of Boston, Mass., Thomas Hunt, of Boston, Mass., and Edward S. Rogers, of New York City, for defendant.

HALE, District Judge.

In this case the plaintiff alleges that in the year 1915 it put on the market an entirely novel pharmaceutical preparation to be used as an inhalant for the relief of colds in the head.

That upon putting this novel preparation on the market, it adopted the word "Vapex" as a trade-mark, and that under this mark the product has been continuously sold in England since July 7, 1915, and in the United States since 1922.

That, at the time plaintiff adopted the mark "Vapex," no person or firm in the United States had the right to use that mark or any other one resembling it, and that such word, or any word confusingly similar to it, had never been used in the United States or elsewhere by any other person for a similar preparation.

That the mark "Vapex" was registered in England on February 27, 1915.

That the mark was registered in the United States Patent Office on March 18, 1924, under No. 181,259.

That prior to the commencement of the acts complained of, the plaintiff extensively advertised and used said trade-mark throughout the United States of America, and that it had built up a very large and valuable business and good will in the United States, which was a source of great profit.

That prior to the acts of infringement complained of, no other person or firm in the United States used a trade-mark or trade-name to designate a similar and competing preparation beginning with "Vap," save for occasional cases of infringement which may have occurred.

That prior to the commencement of this action the defendant was duly notified of plaintiff's rights and of the fact that Vapex had been registered in the United States Patent Office.

That in the early part of the year 1924, at which time plaintiff's preparation sold under its trade-mark Vapex was well known in the United States of America, plaintiff negotiated in confidence with defendant for the sale of the formula and business in the United States, together with the trade-mark "Vapex," and that later, when negotiations were broken off, the sample bottle of Vapex left with defendant was returned with parts of its contents removed.

That in the year 1927 defendant began to sell a preparation similar to Vapex.

That prior to the commencement of this action defendant gave special inducements to the managers and clerks in its drug stores to push the sale of the preparation Vapure.

That prior to the commencement of this action clerks in defendant's store sold Vapure on requests for Vapex by retail customers; that the defendant has passed off its Vapure preparation on purchasers who desired plaintiff's preparation Vapex; that defendant has persuaded prospective retail purchasers to take its preparation Vapure, by misrepresenting that Vapure and Vapex were owned by the same company, were the same products, and by many other misrepresentations.

That on discovering the confusion in the public mind and the defendant's passing off and misrepresentations, plaintiff notified defendant thereof and demanded that defendant discontinue the misrepresentations and passing off and discontinue the use of the name "Vapure," all of which defendant refused to do.

That by reason of the similarity of the names "Vapex" and "Vapure," the public has been deceived into purchasing defendant's preparation Vapure as and for plaintiff's preparation Vapex.

That by reason of the passing off and misrepresentations, the public has been de-

ceived and induced to purchase Vapure for Vapex.

That the name "Vapure" is a deceptive simulation and infringement of "Vapex," and that the use of the name "Vapure" is calculated to and does cause clerks to pass off Vapure as and for plaintiff's "Vapex," and to make misrepresentations.

That by reason of these acts plaintiff's business in its Vapex in the United States had been seriously injured, and plaintiff has been caused great damage.

That the name "Vapex" has acquired a meaning in the United States as indicating the unique preparation of the plaintiff.

That the acts of the defendant constitute unfair competition, in that the defendant has knowingly and willfully deceived the trade and public into purchasing its product Vapure as and for Vapex, and has sold Vapure to customers who have been attracted by plaintiff's advertising and did not clearly remember the name "Vapex" when they asked for that preparation.

That this court has jurisdiction over the action because it is brought by a foreign corporation against citizens of the United States, and because the action was brought to restrain an infringement of a trade-mark registered in the United States Patent Office, and because the defendant has made large profits and caused the plaintiff great damage by reason of the acts complained of. And that such profits and damage exceed the sum of $100,000. That the value of the business and good will herein sought to be protected exceeds the sum of $100,000.

The defendant denies that it has competed unfairly with the plaintiff and that the public has been deceived or confused in the names "Vapure" and "Vapex" by any representations which it has made. It makes a substantial denial of plaintiff's material allegations.

In cases of alleged infringement of trade-mark and unfair competition, the courts hold that where rights to the exclusive use of the trade-mark are invaded the essence of the wrong consists in the sale of goods of one manufacturer and vendor as those of another; and it is only when this false representation is made that the party who appeals to the court for relief can have such relief. Delaware & H. Canal Co. v. Clark, 13 Wall. (80 U. S.) 311–322, 20 L. Ed. 581.

The plain question is, whether or not the plaintiff by a preponderance of evidence has proved its material allegation that by reason of the similarity of the names "Vapex" and "Vapure" and by unfair competition the public has been deceived or is likely to be deceived into purchasing Vapure, the preparation of the defendant, as and for plaintiff's preparation, Vapex.

At the threshold of the case important preliminary questions have been raised. I prefer to pass at once to the consideration of the vital question: Has the plaintiff proved unfair competition by a preponderance of evidence?

It appears from the testimony that in 1915 the plaintiff discovered and marketed in England a novel pharmaceutical preparation to be used as an inhalant for the treatment of colds and similar ills, to which it gave the name of "Vapex." This preparation came into public use in England, and in 1922 was introduced into this country and was continuously sold here subsequent to 1922.

It appears that the defendant owns a chain of drug stores throughout the United States. In most of its stores it sells a pharmaceutical product under the trade-mark "Vapure," such trade-mark being registered in the United States Patent Office to the United Drug Company.

Products to which the marks "Vapex" and "Vapure" are applied are similar in their natures and in their use. It appears that Vapure is dealt in by many hundred stores throughout the United States which are commonly called "Rexall" stores, and which hold a contract with the United Drug Company for the distribution of goods manufactured by the United Drug Company.

Joseph B. Walters, a former Liggett clerk in the sales department, testified—I give a brief summary:

"When I worked for the Liggett Drug stores I sold Vapex when it first came out. I am acquainted with the preparation called Vapure. It was put into the Liggett stores in 1927. We sold Vapex before we sold Vapure. I know of no other handkerchief inhalant on the market before Vapex. When people came in and asked for handkerchief inhalant we sold them Vapex. When people asked for handkerchief inhalant advertised in the papers and did not remember the name, we used to sell Vapex.

"When Vapure came into the store we were given instructions by Mr. Judge, District Manager, to sell Vapure. When Vapure came into the store our instructions were if

people inquired for a handkerchief inhalant to sell Vapure. We were instructed 'it was supposed to be the same thing as Vapex; that it was only half the price.' There were some other instructions but I do not remember just exactly what they were.

"After Vapure came into the Liggett Drug Store if a woman came in and asked for handkerchief inhalant the clerks sold her Vapure. If a woman came in and asked for a handkerchief inhalant advertised in the papers, without remembering the name, we sold her Vapure, although Vapex was being advertised in the papers. I know of no advertising of Vapure in the papers.

"We were instructed by Mr. Hoffman, who was in charge, who said: 'You all know what this is of course.' He related what was in it,—menthol, acetone and eucalyptol, and still having the bottle in his hand he said, 'Of course we don't call it Vapex, of course we can't; we call it Vapure as that is as close as we can get to it.' He said it was the same thing,—'We think Vapure is better.' He said they had sold a million and a half bottles of Vapure that year. After Vapure came into the Liggett store I and the other clerks sold Vapure. When people asked for Vapex, I used to try to sell them Vapure. I never sold a bottle of Vapex.

"In May, 1929, I left the Liggett Stores. I was transferred to Westfield. I stayed there about a week, then I went on a vacation and never came back. I went down to the shore and got a position. I had some difficulty with Mr. Hoffman and did not go back."

Samuel Rosenfeld in behalf of the plaintiff testified—I give a brief summary:

"I was employed by the Liggett Company from 1923 to 1929 as Assistant Manager in the store in Providence. I sold all over the store. I sold the product known as Vapex, and also sold the product known as Vapure. No commission was ever paid by the Liggett Stores on the sale of Vapex. A commission was paid on the sale of Vapure,—5¢ a bottle. A commission paid for selling other items of Rexall products besides Vapure. Such products were called 'own goods.' The Liggett Stores wanted the clerks to push 'own goods,' and clerks had the advantage of making some money if they sold 'own goods' and a better chance of getting a better position.

"When customers came in and asked for a handkerchief inhalant without remembering the name we would sell them Vapure. We had cases in which a customer asked for an inhalant and we gave them Vapure and the customer said 'Vapex' was wanted in-

stead. It was quite seldom that a customer came in and asked for a handkerchief inhalant without remembering the name. When this happened, we pushed Vapure.

"The paper advertising and the talk to customers, and the difference in price, is what sold Vapure.

"We have never been confused between the names of Vapure and Vapex. When a customer asked for some kind of an inhalant and did not know the name of it, we gave him Vapure. When he wanted Vapex, he got the Vapex.

"The witness testified to several other medicines of 'own goods.'

"The similarity of the name between Vapex and Vapure did not necessarily help me to remember that Vapure was 'own goods' item corresponding to Vapex. The knowledge that I was paid a commission made me know what Vapure was.

"The witness was asked if he knew of any other goods in which the similarity between the names of an independent preparation and 'own goods' was as close as in the case of Vapex and Vapure. He said he did, and mentioned 'Agarex.' He thinks there were other cases which he did not recall.

"He testified further as to the sale of many articles of 'own goods,'—'I remember cases where customers came in and asked for handkerchief inhalant and remembered part of the word; they would remember 'vape' and when this happened, we would sell them Vapure. I remember an instance in which the customer after being offered Vapure said that Vapex was wanted.

"In cross-examination he was asked whether or not he 'passed off' Vapure to any customers when they called for Vapex, and he answered, 'No, sir,' and that he saw no other clerk 'pass off' Vapure on calls for Vapex. He said, 'In fact we were told when a customer asked for a certain item whether it was "own goods" or not to give customer whatever he asked for'—that that was the instruction of the Company to its clerks.

"He was asked, 'In your stores did they have a card or some other placard with a warning on it to sales people against substitution?' He answered, 'Yes, sir.' 'No official ever instructed me as a clerk to "pass off" Vapure for Vapex.'

"Vapex was not well known when Vapure first came into the store. He was asked if there were other cold treatments beginning with the word 'vap,' and answered: Vapocresoline and Vicks' Vapo-rub, the best.

known of these cold treatments was Vicks' Vapo-rub.

"In further cross-examination, he testified:

"Q. 86. Well now the Liggett stores carried Vapex while you were with them? A. Yes, sir.

"Q. 87. And you sold Vapex? A. Yes, sir.

"Q. 88. And if a customer asked you for Vapex you readily supplied it, didn't you? A. Yes, sir.

"Q. 89. And that was true of other clerks who were working with you? A. As far as I know, yes."

"He testified that to the best of his remembrance the Liggett Stores handled only two kinds of handkerchief inhalants."

Lindsay Rawlinson was called by the plaintiff. He testified that he was production manager of E. Fougera & Co.; that he had been connected with them about three and a half years; that he had made investigations about the tactics of the Liggett stores with reference to the sale of Vapex and Vapure. I give a material part of his testimony:

"Q. 7. I ask you to look at a memorandum sworn to by you on November 11, 1927, to refresh your recollection, and please state the nature of the investigation you made and the result of that investigation? A. In this case Mr. Powers and myself called on several of the Liggett's stores uptown and asked for Vapex, and in this particular instance the clerk offered us Vapure and said it was the same thing.

"Q. 8. Please give the address of the store with reference to which you are testifying? A. This store was at 23rd Street and Sixth Avenue, New York City.

"Q. 9. And what was the date of the visit? A. 11th of November, 1927.

"Q. 10. Just state as well as you can, using the memoranda if you wish, what you said to the clerk and what the clerk said to you in this store and on that day? A. We asked the clerk for a bottle of Vapex and he said 'We sell Vapure which is the same thing,' and when we asked him if it was as good as Vapex he said it was a better product and that they guaranteed it. It contained nothing except the purest essential oils; that is in the memoranda here.

"Q. 11. Who is Mr. J. V. Powers whose signature appears upon this memorandum? A. Mr. Powers is an officer and employee of Fougera & Company. He is the General Manager.

"Q. 12. I show you another memorandum verified November 11, 1927, and ask you to state the investigation about which you made this memorandum, giving the date and the location of the store and just what occurred? A. This was a call on November 11, 1927, which store is located on Broadway and 71st Street, New York City.

"Q. 13. What kind of a store is that? A. The L. K. Liggett Store at Broadway and 71st Street, New York City. We asked the clerk for Vapex and were informed that the store specialized in Vapure which the clerk said was the same thing. We asked him if it was exactly the same thing and he said that it was the same idea but that Vapure was made by their Company and Vapex was imported.

"Q. 14. Who accompanied you on this visit? A. Mr. J. V. Powers again.

"Q. 15. I hand you another memorandum verified November 11, 1927, and ask you to state the investigation which is reported in this one? A. This was a call made by Mr. Powers and myself at the L. K. Liggett Store, Broadway and 65th Street, New York City.

"Q. 16. What date? A. On November 11, 1927. We asked the clerk for Vapex and he brought out a bottle and at the same time brought out a bottle of Vapure. He said, 'Why not take Vapure and save 45 cents?' We mentioned that Vapex had been used by us and we found the results satisfactory and we preferred it. The clerk said that Vapure was the same thing, that Vapure is identical and we questioned him further He said there was no secret about Vapex and that its formula and the formula of Vapure was simple and could be found in any pharmacy textbook. He further stated that the reason why Vapex cost 95 cents was that the extra 45 cents above the Liggett price for Vapure was made necessary by cost of distribution and importation.

"Q. 17. I hand you another memorandum verified November 11, 1927, and ask you to state the investigation reported in this memorandum? A. This was a visit made by Mr. Powers and myself November 11, 1927, to the store of L. K. Liggett & Company, Broadway and 24th Street, New York City. We asked for Vapex. The clerk said 'We only carry here the American Vapex which is called Vapure.' He produced a bottle of Vapure and told us to try it and said, 'You will find it just the same.' We told him it did not smell the same to us and he said 'the

basic ingredient is acetone and whereas Vapex may have a different combination of essential oils which would change the smell a bit, there is really no difference as you will find Vapure just as effective. We know because we are selling hundreds of bottles of it.'

"Q. 18. Mr. Rawlinson, when these memoranda were made did they correctly state just what had occurred at these various visits or interviews? A. Why, yes.

"Q. 19. I hand you another memorandum verified on November 11, 1927, and ask you to state the result of this investigation? A. This visit was made on November 11, 1927, at the Louis K. Liggett Store, Broadway and 9th Street, New York City. We asked for Vapex and were informed that the store did not stock it. The clerk then produced a bottle of Vapure and made the positive assertion that it was the same as Vapex and that the formulæ were the same and the only difference was that one was imported but that Vapure was their own product and cost but 50 cents.

"Q. 20. In your last answers you have been saying 'we.' Who was the other person who accompanied you on these visits? A. Mr. Powers accompanied me on all these visits.

"Q. 21. I hand you another memorandum verified November 11, 1927, and ask you to state the result of this investigation. A. This visit was made on November 11, 1927, at the Louis K. Liggett Store at 23rd Street and Sixth Avenue, New York City. We asked for Vapex and were informed by the clerk, 'We sell Vapure which is the same thing.' Upon discussing the relative merits of Vapex and Vapure the clerk stated positively that Vapex was the better product and that they absolutely guaranteed it and that it contained nothing but the purest essential oils.

"Q. 22. I hand you another memorandum verified November 11, 1927, and ask you to state the result of the investigation referred to in this memorandum? A. This was made November 11, 1927, at the store of Louis K. Liggett Company, Broadway and 71st Street, New York City. We asked for Vapex and were informed that the store specialized in Vapure which the clerk said was the same thing. Upon being asked if it were exactly the same thing he further stated that it was the same idea but that Vapure was made here by the Liggett Company and that Vapex was imported, which was the reason it cost $1 whereas Vapure cost but 50 cents."

In cross-examination the witness said he did not know with whom he talked at the store on Fifth avenue. The witness testified that the clerks were not identified with whom he had the conversations, and that generally the conversations were in the nature of comparisons of the merits of Vapure and Vapex.

In cross-examination he said:

"Well, we just wanted to find out if the Liggett Stores were carrying Vapex and what stores had it and the general attitude of the Liggett organization to customers who asked for Vapex.

"XQ. 78. Well now, you found at most of the stores that you could obtain Vapex if you wanted it, didn't you? A. I don't recall that. I could not say offhand just which ones sold it to us and which ones did not.

"XQ. 79. But those that did stock it gave it to you on your call for Vapex, did they not? A. They did not refuse to sell it, they offered Vapure, in some cases, they tried to sell us Vapure but when we insisted that we wanted Vapex we bought it, they sold it to us."

The plaintiff introduced copy of a letter from General Manager Powers, in which he says:

"In the store at 9th and Market, the clerk on being asked for Vapex produced it and at the same time brought out a bottle of Vapure which he said was identical with Vapex and that Vapex cost more because it was advertised, etc. At the store on Chestnut Street above 13th, the clerk instead of bringing out Vapex when it was asked for produced Vapure and said 'wouldn't you like to save 50¢' and then argued that the product was just the same and contended that Vapex was imported, etc., and thus cost more."

The plaintiff offered testimony that investigators sent to Liggett stores in different cities asked for a bottle of the stuff inhaled for colds which begins with a "V," and notwithstanding Vapex only met this description, as there had been no advertising of Vapure in the Sunday papers, in nearly every instance Liggett clerks handed out Vapure as answering the order.

Many witnesses have testified to instances where clerks of the defendant company have persuaded customers to buy Vapure instead of buying Vapex. There is testimony that the defendant paid a bonus to its clerks on the sale of four hundred or five hundred articles, of which Vapure was one.

There is testimony of instances where a customer came into a store and asked for a

handkerchief inhalant without remembering the name, and the clerk sold Vapure rather than Vapex. There is testimony that Vapure was sold in preference to Vapex by clerks in the Liggett stores; and that in the competition in those stores Vapure was sold rather than Vapex.

Dorothy Woolcott testified that she went into the Grand Central (New York) store of defendant and asked a clerk for Vapex. She noticed that he was wrapping up something else. She told the clerk she did not want it. He told her that it was just as good and cheaper, but she refused to purchase it and bought Vapex. She did not know the clerk's name or have any way of describing or identifying him, and according to her best recollection, it happened "in February, 1929."

Harry S. Ashmun testified that he went into a Liggett store in Syracuse during the second week in January, 1928 (he was testifying on November 6, 1930), and asked for a bottle of Vapex and "got the bottle and went outside, and shortly thereafter, I don't know whether I waited on the train or whether it was in the street going to the train, I opened the bottle and found I had something else smelling different, and I looked at it and found it was Vapure." He is not sure where the store was located. He says it was located "on the main business street, which I believe is Salina Street, and is located on the right hand side walking away from the railroad station." His brother Bernard I. Ashmun was called to corroborate Harry. They were together at the time. He was asked if he knew whether the store in which his brother made the purchase was a Liggett store and he answered: "The funny part of it was I was in this store this summer and I am not so sure, but my impression is, yes. I have been in twice within the last three weeks, the same place; I can't tell you for sure." He was then shown a Vapure carton and asked if that was like the carton his brother obtained in the store and he answered: "No, as I say it is not—my impression is that is what he got absolutely, but at the time it made so little impression on me that—of course, I did not know anything about this, anything that would transpire later so that I paid very little attention to these things except the general result was that he did not get what he asked for and called attention to the fact that he did not get what he asked for."

Carolyn Willing went to a Liggett store in Wilmington at the instance of an investigator who had called at her door and asked her to go to Liggett's store, giving her $1 with which to make a purchase. She testified on December 9, 1930, that she went to the store in August, 1929, asked for Vapex and got Vapure. She did not remember whether a man or a woman waited on her in the store. She did not remember what the article she bought cost. The investigator gave her a dollar and "Didn't ask for any change in return," and she does not know what part of the dollar was expended in purchasing the article. On cross-examination she answered: "I didn't pay a dollar. I did get change, I don't remember. I was not interested in just what was going on. She asked me to buy it and I did."

The defendant introduced the manual of Liggett drug store service which has been in effect for many years and provides as follows:

"VIII. No Substitution.

"This Company will not tolerate substitution or any attempt at substitution, and any invasion or attempted evasion of this rule on the part of any Salesperson will be sternly dealt with.

"That the Customer *must have what he asks for* if we have it in stock, or can procure it for him in accordance with our rules, is a fundamental principle of good service.

"There are two reasons for our rule of No Substitution. The first is that the Customer must be given credit for knowing what he wants and why he wants it; any attempt to induce him to change his mind is likely to be resented.

"The second is that we stock Manufacturers' goods because there is a demand for them, and those Manufacturers who have supplied us with their merchandise for which they have created a demand, are entitled to a square deal at our hands.

"A Salesperson, through a misguided sense of loyalty may attempt to induce a Customer to accept a corresponding piece of Own Goods in place of the article he has asked for; in such a case the Manager must properly instruct the Salesman in respect of the Company's policies."

The defendant called several district managers and store managers. One of the district managers, Warren G. Swett, testified that he had been with the Liggett Company about forty-four years and district manager for twenty years in Northern New England; that the duties of the district manager are the supervising of stores so far as sales are concerned, and having to do with the person-

nel and character of the organization; that he and other district managers have to do with the employing and discharging of store managers. The district managers visited the different stores in other districts; that their duties are to examine and see how the merchandise is displayed, how the store is kept, and the whole personnel of the store. He and other district managers are well-informed on the condition of things in the different stores.

Swett testified that he was familiar with Vapex and with Vapure, and that Vapure was the first in stores in his district; that Vapure was there in September, 1927, and he thinks Vapex came in that same fall. That if any clerk in any of his stores had "passed off" Vapure for Vapex, the clerk would have been discharged, because it was against the policy of the company to substitute—"Because it is deception—it is putting something over on your customer. It is not only violating the confidence of the people who manufacture the preparation, but violating the confidence of your own customers." That no clerk could stay with the Liggett stores if he substituted; that we could not afford to offend customers; that he is familiar with the manual with respect to substitution; and that that represents the policy of the company. That no cases of substitution of Vapure for Vapex have been reported to him, and no complaint made; that if there had been substitution he would have known about it. This is his job.

On cross-examination he thought that the names of "Vapex" and "Vapure" were quite close to each other, but no closer than another article which he named. That he has had "drives" of Vapure, but has never had any drive in Vapex.

He was asked if a customer went into a Liggett store where there was a drive on Vapure and asked for bromo-quinine whether the clerks would suggest Vapure, and he answered, "Yes, he would." The clerk would suggest it whenever the physical condition of the customer suggested the use of that article. He said he considered it perfectly legitimate to suggest one of the Liggett's "own products" when no attempt was made to give something different from what the customer asked for.

He said Vapure was kept on the top of the counter, and if a lady came in and asked for Vapure, all the clerk would have to do was to reach over the counter and wrap it up and give it to her; but if she asked for Vapex he would have to go to the back of the store and come back with it.

I have given the testimony of Swett quite fully. The testimony of the other district managers was similar. It appears from their testimony that their work carried them into all the stores in their respective districts. It was their business to inspect the stores, observe the managers and sales people, and generally to represent the defendant's management in the operation of stores in their several districts. These district managers testify that they have never observed any instances of "passing off" Vapure for Vapex; that they were in such touch with the stores that if "passing off" should develop as a course of conduct in any of the stores they would soon know about it; they reiterated the declaration of the policy of the Liggett stores as contained in the manual which I have recited.

Some of the managers on cross-examination admitted that it might be "possible" for a clerk some time to violate a rule of the company and the district manager not know about it. The district managers agree, I think, in testifying that "passing off" does not exist in the Liggett stores, and that the life of the Liggett business depends on there being no "palming off" of one thing for another, because a business catering to a large trade could not live if "palming off" was habitually and systematically practiced. Customers would be offended and the good will of the business destroyed.

It is, of course, impossible to recite all the testimony in the case. I have referred to material portions of such testimony. I have stated quite fully the testimony introduced by the plaintiff tending to show the kind of competition in the Liggett stores. I have also stated the testimony of Dorothy Woolcott and two or three other witnesses who have testified to the acts of certain unidentified clerks in making alleged substitution of Vapure for Vapex.

The plaintiff contends that it has met the burden of proving unfair competition by showing by testimony obtained by investigators from former employees of the defendant that competition has been entered into in the Liggett stores which the plaintiff alleges to be unfair. The plaintiff also contends that the few instances of substitution of Vapure for Vapex by unidentified clerks in the Liggett stores are sufficient to prove unfair competition, and such deception, sub-

stitution, and confusion as entitle the plaintiff to relief.

█ I cannot sustain the plaintiff's contention. I think the testimony does not by a preponderance of evidence sustain the allegation that by reason of the similarity of the two names and by reason of the "passing off" and misrepresentations and deceptions the public has been deceived, or are likely to be deceived and induced to purchase Vapure for Vapex.

In Howe Scale Co. v. Wyckoff, Seamans, etc., 198 U. S. 118, 140, 25 S. Ct. 609, 614, 49 L. Ed. 972, in speaking for the court, Mr. Chief Justice Fuller said:

"The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another; and if defendant so conducts its business as not to palm off its goods as those of complainant, the action fails."

The isolated instances of alleged substitution are not, in my opinion, sufficient to prove unfair competition. The testimony in the case clearly shows competition, sharp competition. Clerks in different stores were encouraged to sell Vapure—it was "own goods." Clerks were encouraged to make comparisons of the superior appearance of Vapure over Vapex or over any other similar product. All this has been done openly by defendant.

The testimony in behalf of the plaintiff which I have cited shows that the clerks in defendant's stores were in the habit of arguing to a customer that Vapure was substantially the same thing as Vapex; that it was just as good and cheaper. Instead of "palming off" Vapure upon a customer who thought he was buying Vapex, these clerks appear to have been in the habit of insisting that Vapure was better and cheaper to buy than Vapex.

I think the plaintiff's witness Rawlinson is correct in his testimony indicating that, as a rule of conduct in the Liggett stores, clerks did not refuse to sell Vapex. That when customers "wanted Vapex, they got it." As a rule of conduct I think the preponderance of testimony shows that the conduct of the defendant's stores was not the conduct of deception, confusion, or "palming off."

"Unfair competition" is the sale of goods of one trader as the goods of another. A clerk cannot make an argument comparing and contrasting the greater virtues of one article over another without distinguishing between the goods of the two parties.

The plaintiff contends that the verbal similarity between Vapex and Vapure is in itself unfair competition, in addition to being trade-mark infringement. I think not. There is testimony in the record tending to show that the first syllable "vap" derived from the word "vapor" was well known to the public before Vapex or Vapure were brought before the public.

In the use of the two words, the termination "ex" and "ure" are entirely dissimilar. I think the use of Vapure for Vapex as shown by the testimony should not in itself be regarded as unfair competition unless it is shown to be accompanied by deception, confusion of, or the intention of "palming off." I think such intention is not shown by a preponderance of the evidence in the case.

I think the proofs show that defendant has done all it would be expected to do, or could do, to prevent clerks from making any substitution of Vapure for Vapex. I have quoted quite fully testimony upon which plaintiff relies to show substitution, deception, and confusion produced by the defendant. I think the testimony fails to show that the defendant has been guilty of "palming off," or deceiving, or confusing the public.

█ It clearly is not unfair competition to persuade customers to buy one article instead of another. The law does not seek to prevent competition. It seeks to restrain deceptive practices.

In Saxlehner v. Wagner, 216 U. S. 375, 380, 30 S. Ct. 298, 54 L. Ed. 525, in speaking for the court, Mr. Justice Holmes said:

"We see no reason for disturbing the finding of the courts below, that there was no unfair competition and no fraud. The real intent of the plaintiff's bill, it seems to us, is to extend the monopoly of such trademark or tradename as she may have to a monopoly of her type of bitter water, by preventing manufacturers from telling the public in a way that will be understood, what they are copying and trying to sell. But the plaintiff has no patent for the water, and the defendants have a right to reproduce it as nearly as they can. They have a right to tell the public what they are doing and to get whatever share they can in the popularity of the water by advertising that they are trying to make the same article, and think that they succeed. If they do not convey, but, on the contrary, exclude, the notion that they are selling the plaintiff's goods, it is a strong proposition that when the article has a well-known name, they have not the right to explain by that name what they imitate. By

doing so, they are not trying to get the good will of the name, but the good will of the goods. See Flagg Manufacturing Co. v. Holway, 178 Mass. 83, 91, 59 N. E. 667; Chadwick v. Covell, 151 Mass. 190, 191, 23 N. E. 1068, 6 L. R. A. 839, 21 Am. St. Rep. 442.

In Walter Baker & Co. v. Slack, 130 F. 514, 519, the Circuit Court of Appeals in the Seventh Circuit had before it a matter of unfair competition in reference to Baker's chocolate. The court said:

"The purchaser was entitled to that for which he had asked. We do not mean to say that it is not within the province of the seller to represent to the proposing purchaser that another article which he has is superior in excellence to that which is called for, and to induce him by proper argument or statement to purchase that other, but he must not represent such other to be the product which the purchaser had called for."

In Cole Co. v. American Cement & Oil Co., 130 F. 703, 708, the Circuit Court of Appeals in the Seventh Circuit said:

"The law of unfair trade has never gone to the length of preventing fair competition in trade. The law seeks only to restrain fraudulent practices inducing confusion of goods and deception of the public."

In Ward Baking Co. v. Potter-Wrightington, 298 F. 398, 401, 403, the Circuit Court of Appeals in the First Circuit had before it infringement of a trade-mark "Old Grist Mill" and a pictorial representation of such old mill. The court based its decision upon the ground of deception having been practiced by the defendant. The court said:

"Upon a careful examination of the wrappers and the proofs, we are of the opinion that the use by the defendant of the words 'Old Grist Mill' and of its picture and advertisement is deceptively similar to the use by the plaintiff, and is an infringement of the plaintiff's rights in its trade-mark. We agree with Judge Anderson, in the District Court, in holding that the wrongful conduct of the defendant was deliberate and persistent; that it was a case of undertaking to appropriate the property of the plaintiff, and to mislead the public into buying its own products when the products of the plaintiff were sought. * * *

"We think the test should be whether the public is likely to be deceived. Both the plaintiff and the defendant are seeking to induce people to use a whole wheat flour in bread; the representations of the defendant clearly tend to induce the user of flour to believe that he is getting the plaintiff's flour in his bread, when, in fact, he is getting the defendant's flour."

In Wrisley v. Iowa Soap Co., 122 F. 796, 798 (C. C. A. 8th Cir.), Judge Sanborn, in speaking for the court of the duty of the manufacturer, said:

"He [the manufacturer] is not, however, required to insure to the negligent or the indifferent a knowledge of the manufacture or the ownership of the articles he presents. His competitor has no better right to a monopoly of the trade of the careless and indifferent than he has, and any rule of law which would insure it to either would foster a competition as unfair and unjust as that promoted by the sale of the goods of one manufacturer as those of another. One who so names and dresses his product that a purchaser who exercises ordinary care to ascertain the sources of its manufacture can readily learn that fact by a reasonable examination of the boxes or wrappers that cover it has fairly discharged his duty to the public and to his rivals, and is guiltless of that deceit which is an indispensable element of unfair competition. [Citing several cases.] * * *

"There is testimony in the record that some people have bought, and that some retail dealers have sold some of the soap of the defendant as that of the plaintiff. But this evidence falls far short of satisfactory proof that either purchasers or dealers could have been deceived into buying or selling one for the other if they had exercised any ordinary degree of care to ascertain whose manufacture they were purchasing either by listening to the name of the article or by glancing at the wrapper which inclosed it."

In United Drug Co. v. Rectanus, 248 U. S. 90, 97, 39 S. Ct. 48, 63 L. Ed. 141, in speaking for the court, Mr. Justice Pitney said:

"The asserted doctrine is based upon the fundamental error of supposing that a trademark right is a right in gross or at large, like a statutory copyright or a patent for an invention, to either of which, in truth, it has little or no analogy. [Delaware & H.] Canal Co. v. Clark, 13 Wall. 311, 322 [20 L. Ed. 581]; McLean v. Fleming, 96 U. S. 245, 254 [24 L. Ed. 828]. There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows

out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business. Hanover [Star] Milling Co. v. Metcalf, 240 U. S. 403, 412–414 [36 S. Ct. 357, 60 L. Ed. 713].

"The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly. See United States v. [American] Bell Telephone Co., 167 U. S. 224, 250 [17 S. Ct. 809, 42 L. Ed. 144]; Bement v. National Harrow Co., 186 U. S. 70, 90 [22 S. Ct. 747, 46 L. Ed. 1058]; Paper Bag Patent Case, 210 U. S. 405, 424 [28 S. Ct. 748, 52 L. Ed. 1122].

"In truth, a trade-mark confers no monopoly whatever in a proper sense, but is merely a convenient means for facilitating the protection of one's good-will in trade by placing a distinguishing mark or symbol— a commercial signature—upon the merchandise or the package in which it is sold."

See Delaware & H. Canal Co. v. Clark, 13 Wall. (80 U. S.) 311, 322, 20 L. Ed. 581; Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713.

In Delaware & H. Canal Co. v. Clark, 13 Wall. (80 U. S.) 311, 322, 20 L. Ed. 581, Mr. Justice Strong said:

" * * * In all cases where rights to the exclusive use of a trade-mark are invaded, it is invariably held that the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another; and that it is only when this false representation is directly or indirectly made that the party who appeals to a court of equity can have relief. This is the doctrine of all the authorities."

The rule is thus laid down in Federal Trade Comm. v. Klesner, 280 U. S. 19, 50 S. Ct. 1, 3, 74 L. Ed. 138, 68 A. L. R. 838, where Mr. Justice Brandeis said (27):

"It is true that in suits by private traders to enjoin unfair competition by 'passing off,' proof that the public is deceived is an essential element of the cause of action. This proof is necessary only because otherwise the plaintiff has not suffered an injury."

The learned counsel for the plaintiff has brought to my attention Mr. Nims' text-book in which attention is called to the fact that passing off is no longer a requisite of the unfair competition action, and that this action has expanded in recent years. He says later, although no passing off was proven, injunctions were issued against acts that might result in passing off, if continued. He says:

"Such a case was Asso. Press v. International News Service [(D. C.) 240 F. 983], where no passing off of defendant's goods as those of plaintiff was shown. In this case the injury was rather the sale of plaintiff's goods as defendant's.

"Judge Learned Hand has thus expressed the purpose and character of the action [Ely Norris Safe Co. v. Mosler Safe Co. (C. C. A.) 7 F.(2d) 603]:

" 'While a competitor may, generally speaking, take away all the customers of another that he can, there are means which he must not use. One of these is deceit. The false use of another's name as maker or source of his own goods is deceit, of which the false use of geographical or descriptive terms is only one example. But we conceive that in the end the questions of use are always two: Has the plaintiff in fact lost customers? and has he lost them by means which the law forbids.'

"Judge Hand in the same opinion adds:

" 'Yet there is no part of the law which is more plastic than unfair competition.' ·

"Such a definition does not limit the court to cases between competitors nor to acts which constitute passing off. Under such a definition the finespun and absurd distinctions which have been drawn in attempts to define 'goods of the same descriptive properties' disappear. There are but two questions to be answered: (1) Has the plaintiff lost custom, or is there any reasonable possibility that he may lose custom? (a) Is such loss through acts of another which a court of equity would consider unfair? It is to be noted, however, that there must be some quality of illegality in the defendant's conduct as distinguished from its being merely contrary to a whim of the court or to the personal ethical notions of the judge as contrasted with the standards of fairness prevailing in the community. Judge Hough spoke once of a defendant's conduct shocking the sense of fairness of the court. It seems that the touchstone of the legality of conduct in business has become the accepted standard in the community of what is fair play. There was a time when it was not unlawful to pass off one's goods as the goods of another. The decisions that have condemned that practice are nothing less than the judicial recognition of the general feeling that such acts are unfair and inflict an injury

which the plaintiff cannot fairly be called on to suffer. The nature of the act of passing off has not changed, but our ideas of what is fair, have changed. To such changes the equity Judge must necessarily be sensitive."

Likewise, on page 31, Mr. Nims states as follows:

"The power of a court of equity is apparently no longer confined to merely restraining another from selling falsely represented goods, but has been extended to prevent a deception of the general public into believing that good-will, or investment, of another, are enjoyed by or is a part of another's business, so that the ordinary public would be led to believe that, in dealing with such person, it was also dealing in some way with the other."

It appears, then, that Judge Hand has substantially stated the intention of the law on unfair competition to be "to prevent deception of the general public." This conforms to the leading decisions which I have cited.

Nims recites definitions of "unfair competition" which are the same as those upheld by the leading cases which I have cited. From cases referred to by Nims, he says:

"The competitor in business must not by any deceitful or other practice impose on the public."

He says further:

"The motive of trade competition, set up in justification of acts causing injury to plaintiff's business, may be subjected to the test of good faith."

He cites Helfi Co. v. Silver Co. (D. C.) 274 F. 653, 655, affirmed (C. C. A.) 278 F. 613. In that case Judge Dickinson said:

"The doctrine of the law of unfair competition · · · is built upon the right of every man to the enjoyment of the benefits of the business as well as the personal reputation he has made for himself. No rival is permitted to deprive him of this personal reputation by destroying it by the arts of detraction or slander, or to divert the benefits of this business reputation by creating the deception that what the one is selling is what the other has made." Nims on Unfair Competition (3d Ed.) pp. 19 and 496.

The plaintiff's statement of its case indicates the intention of charging unfair competition as its material allegation. Mr. Justice Pitney has stated the doctrine of the courts that the law of trade-marks is but a part of the broader law of unfair competition; that there is no such thing as prop-erty in a trade-mark, except as a right appurtenant to an established business; and that the right to a particular mark grows out of its use, not its mere adoption.

■ If I assume that the case at bar seeks to present the question of technical trade-mark infringement, as a proposition apart from unfair competition, I think the proofs do not, by a preponderance of evidence, prove the plaintiff's case.

I have confined myself to a discussion of the material question raised by the pleadings and the proofs. Upon a careful study of the proofs, I find that the plaintiff has not met the burden of proving its case as stated and is not entitled to an injunction or an accounting.

The costs in the case, on both sides, have been large. I prefer to let each party pay its own costs. But, if the case goes further, at its close this court will deal finally with the question of costs. A decree may be presented dismissing plaintiff's bill, but without costs.